Clarence WELLS, et al., Plaintiffs–
Appellants,

v.

UNITED STATES STEEL & CARNEGIE
PENSION FUND, INC., Defendant–
Appellee.

No. 90–5957.

United States Court of Appeals,
Sixth Circuit.

Argued March 26, 1991.

Decided Dec. 13, 1991.

Rehearing and Rehearing En Banc
Denied Jan. 30, 1992.

Mark David Goss, briefed, Eugene Goss, argued, Goss & Goss, Harlan, Ky., for Clarence Wells.

Mark David Goss, Goss & Goss, Harlan, Ky., for all other plaintiffs-appellants.

William A. Rice, Rice, Huff & Hendrickson, Harlan, Ky., James T. Carney (argued & briefed), USX Corp., Pittsburgh, Pa., for defendant-appellee.

Before KENNEDY and RYAN, Circuit Judges, and FEIKENS, Senior District Judge.[*]

RYAN, Circuit Judge.

The plaintiffs, retirees of United States Steel Corporation, appeal the grant of summary judgment in favor of the defendant, United States Steel and Carnegie Pension Fund ("Fund"), in this case brought under the Employees Retirement Income and Security Act (ERISA), 29 U.S.C. § 1132. There are three issues:

1. Whether the district court applied the appropriate standard in reviewing the Fund's interpretation of the Plan's workers' compensation offset provision;

2. Whether the district court properly upheld the Fund's interpretation of the workers' compensation offset provision; and

3. Whether the district court properly entered judgment in favor of the Fund on its counterclaim for overpayment?

We hold that although the district court applied the proper standard, the Fund's interpretation of the Plan language was arbitrary and capricious. We agree with the district court that the Plan language permitted recovery on the defendants' counterclaim for overpayment.

Consequently, we shall reverse, in part, and remand for further proceedings.

## I.

### The Facts

The plaintiffs are thirty-one former employees of United States Steel Corporation who suffer from black lung disease due to their coal mine employment. Upon retirement, they began drawing pension benefits pursuant to the United States Steel Corporation Plan for Employee Pension Benefits ("Plan"). Under the Plan, they receive a contributory and noncontributory pension.

* The Honorable John Feikens, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

They also receive Kentucky workers' compensation benefits, federal black lung benefits, and Kentucky Special Fund benefits.

The noncontributory pension was always subject to an offset for Kentucky workers' compensation benefits. The offset is designed to preclude "double dipping"—receiving both a generous pension from the company to support the employee in his retirement and a liberal workers' compensation payment also financed by the company. Workers' compensation is designed to compensate employees for earnings lost due to a disabling injury but, in the case of a retired employee, it is, in many instances, simply another pension financed by the company.

The Plan also offsets federal black lung trust benefits against the noncontributory pension. This policy also prevents double-dipping because federal black lung benefits are paid from a government-sponsored fund financed by an excise tax on coal production. The offset is made because the noncontributory pension rules and the general provisions of the Plan require an offset against noncontributory pensions for a benefit that is "paid directly or indirectly by an Employing Company." Government funds financed from general revenues would not be offset as this type of arrangement does not "double dip" into employer pockets. Prior to 1976, the Plan provided that "[a]ny amount paid to ... any participant on account of injury or occupational disease ... whether pursuant to workmen's compensation, occupational disease or similar statutory law ... shall be deducted from or charged against" the noncontributory pension. Federal Black Lung Benefits were at that time paid out of general revenues. USX did not seek to offset those benefits since it was not paying for them. In 1976, to reflect this position, it changed the language of the Plan to limit offsets to amounts paid "directly" or "indirectly" by an Employing Company.

The Plan substituted the following provision:

> Notwithstanding anything to the contrary contained in this Plan, workers' compensation, occupational disease benefits and other similar benefits payable with respect to a disability in the nature of a permanent disability will be taken into account in the calculation of pension *only* if such benefits are paid directly or indirectly by an Employing Company.

(Emphasis added.) Thus, the "directly," "indirectly" language was adopted as a limitation on reimbursement.

Thereafter, financing for Federal Black Lung Benefits was changed to an excise tax on coal, and the Plan sought to offset these benefits in their entirety. In *Teer v. United States Steel & Carnegie Pension Fund,* No. CV 82–P–2379–S (N.D.Ala. May 9, 1983), the court determined that the offset of federal funds is permitted under the "directly" or "indirectly" provision of the Plan, but that USX could only offset that portion attributable to employment with USX. Since that percentage attributable to employment with USX was also roughly the percentage paid indirectly by USX, USX was not financing duplicate benefits.

The current dispute involves the Plan's policy of offsetting Kentucky Special Fund benefits against the noncontributory pension. The Kentucky Special Fund is a state-sponsored fund, financed by employer taxes, which compensates victims of black lung disease. The Special Fund benefits are paid in two parts: the first part, 25% of the total payment, is paid directly to the retiree by United States Steel, and the second part, 75% of the total payment, is paid by the Special Fund. This case involves only the offset of the 75% paid by the Special Fund.

In 1986, Anthony Kuchta, the Fund's new case supervisor, learned from the Special Fund director that the Special Fund benefits were financed by special employer taxes.[1] Kuchta concluded that such bene-

---

1. Kuchta was told by Kentucky Special Fund employees that they couldn't determine what percentage was financed by USX. This was in error since as to each year they can and did determine what percentage is paid by USX. Indeed, since USX knew what it was paying each year to the Kentucky Special Fund and knew what each retiree was receiving, it could have computed the percentage easily without asking.

fits should be offset under the Fund's general provisions. Kuchta notified the plaintiffs that pursuant to section 8 of the Plan's general provisions, their pension benefits would be reduced or terminated until alleged overpayments of $6,000–$50,000 per person were recouped. The reduction and termination of benefits adversely affected all of the plaintiffs who, due to old age and incapacity from black lung disease, depended on their fixed income.

The plaintiffs sought a declaratory judgment that the Plan administrator could not offset against their pensions those portions of Special Fund benefits for which the fund and not the company is liable, and that the company was precluded under both equity and state law from recouping any payments already made to the plaintiffs. The Fund counterclaimed for judgment against each plaintiff for recoupment of the erroneous payments.

On December 14, 1987, the trial court entered summary judgment against the plaintiffs. The court found that the Fund's interpretation of the Plan and its method of recoupment were reasonable and rejected the plaintiffs' equitable arguments since the administrator acted quickly upon discovery of the overpayment. The plaintiffs appealed to this court which held that since the district court had not adjudicated the defendant's counterclaim and the issue that had been decided had not been certified for interlocutory appeal, the trial court's order was not appealable as a final order. 842 F.2d 334. On June 22, 1990, the trial court granted the defendant's motion for summary judgment and awarded them $683,429.12 against plaintiffs as recoupment of the overpaid sums. This appeal followed.

## II.

### A.

### Standard of Review on Appeal

■ The district court's grant of summary judgment is reviewed *de novo. EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). Thus, we must determine whether the pleadings, depositions, answers to interrogatories, and ad-

missions on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988).

### B.

### Standard of Review Used by District Court

The pensioners contend that the district court erred in applying the "arbitrary and capricious" standard of review to the plaintiffs' challenge to the Fund's interpretation of the Plan language. This court has held, however, that "the arbitrary and capricious standard applies to decisions by plan administrators under ERISA to deny benefits to particular claimants." *Varhola v. Doe,* 820 F.2d 809, 813 (6th Cir.1987). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court departed from this rule and announced that a *de novo* standard applies when the employer administers the plan and denies benefits based on an interpretation of the plan. However, the Supreme Court held that no change in the former rule is necessary where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. In such a case, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (quoting Restatement (Second) of Trusts § 187 Comment d (1959)). We have held that where a plan gives an administrator discretion to interpret the plan, the arbitrary and capricious standard still applies. *Davis v. Kentucky Fin. Cos. Retirement Plan,* 887 F.2d 689, 694 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990).

■ The Plan granted the administrator discretion to interpret its provisions. Section 7.1(a) of the pension rules provided

that "[t]he Pennsylvania Corporation [the Pension Fund] shall administer these Pension Rules and shall decide all questions arising out of and relating to ... these Pension Rules." Section 7.7 states that "[t]he decisions of the Pennsylvania Corporation shall be final and conclusive as to all questions of interpretation and application of these Pension Rules and as to all other matters arising in the administration thereof." In *Davis*, this court found that similar language indicated that the plan accorded the administrator broad discretion in interpreting the plan. *Davis*, 887 F.2d at 694. The district court correctly determined that the Plan granted the administrator discretion to interpret the Plan and thus properly applied the arbitrary and capricious standard.

## C.

### Interpretation of the Plan

### 1.

### Applicable Law

■ In interpreting the language of a pension plan, courts are guided by principles of trust law. As the Court explained in *Firestone:*

> ERISA abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, "codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts."

*Firestone*, 489 U.S. at 110, 109 S.Ct. at 954 (citations omitted). Under trust law, a plan may give a trustee the power to construe disputed terms, and in such circumstances the trustee's interpretation, if reasonable, will not be disturbed. *Id.* at 111, 109 S.Ct. at 954. As this court has explained: " 'Where both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control.' " *Cook v. Pension Plan for Salaried Employees*, 801 F.2d 865, 870 (6th Cir.1986) (quoting *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 601 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983)).

### 2.

### Plan Language

■ The dispute over the Plan language involves section 3.10 of the noncontributory pension rules and section 11 of the general provisions of the Plan which read as follows:

*Section 3.10*

Any amount paid to or on behalf of any participant on account of injury or occupational disease incurred in the course of his employment by an Employing Company or any other employer causing disability in the nature of a permanent disability that is *paid directly or indirectly by an Employing Company, whether pursuant to workers' compensation, occupational disease or similar statutory law* ..., shall be deducted from or charged against the amount determined in accordance with paragraphs 3.3(b), (c), and (d) and paragraph 3.4 or 3.5....

*Section 11*

Notwithstanding anything to the contrary contained in this Plan, workers' compensation, occupational disease benefits and other similar benefits payable with respect to a disability in the nature of a permanent disability will be taken into account in the calculation of pension only if such *benefits are paid directly or indirectly by an Employing Company.* All such benefits which are financed directly or indirectly by an Employing Company (including benefits paid from the Federal Black Lung Disability Trust Fund or a "second injury fund" established by state law to which an Employing Company is required to contribute by reason of law) shall be taken into account in the calculation of pension; provided, however that the deduction for such benefits paid from the Federal Black Lung Disability Trust Fund or a "second injury fund" shall be limited to the amount, to the extent reasonably determinable, of such benefits attributable to employment with an Employing Company....

(Emphasis added.)  The Fund interpreted these sections to mandate offsetting against pension payments any workers' compensation benefits, as indirectly paid by United States Steel, if financed by special taxes or assessments on employers or on the product produced by employers where United States Steel paid any of those taxes or assessments and the employees received such payments by reason of prior employment at United States Steel.  The district court found that this was a reasonable interpretation of the Plan and granted the Fund summary judgment.

Because the Kentucky Special Fund is financed by an excise tax on all employers doing business in Kentucky, United States Steel contributes only a small portion of the benefits received by its United States Steel retirees.  For example, retiree Vernon Asbridge receives $98.25 per week from the Special Fund, but plaintiffs assert that United States Steel contributes only $4.91 of that payment.  Section 3.10, with appropriate ellipsis, provides that the Fund may offset "[a]ny amount paid to or on behalf of any participant ... paid directly or indirectly by an Employing Company."  The $4.91 which United States Steel pays to the state for retiree Asbridge, and which the state then pays to Asbridge, clearly falls within section 3.10's "paid ... indirectly by an Employing Company" language.  The Fund contends, however, that it may offset the entire $98.25 per week paid to retiree Asbridge despite the fact that United States Steel did not pay $93.34 of the $98.25 into the Fund either directly or indirectly.  We agree with the district judge in *Teer v. United States Steel & Carnegie Pension Fund*, No. CV 82–P–2379–S, mem. op. at 4 (N.D.Ala. May 9, 1983), who, addressing a dispute over the offset of federal black lung benefits under the Plan, stated:

Section 11 therefore limits deduction of disability benefits to those which the employing company pays directly, such as those paid out of company funds, or indirectly, such as those paid through insurance companies or through trust funds established by the employing companies.  Defendant argues that [U.S. Steel] indirectly pays the black lung benefits to plaintiff.  To find that [U.S. Steel] paid the black lung benefits indirectly to plaintiff when the payments were in reality paid from the Black Lung Benefits Trust Fund, to which [U.S. Steel] makes contributions by way of an excise tax on its coal production, would be to take the meaning of the term "indirectly" beyond its limits.

The court in *Teer* did uphold the Plan's general scheme to prevent the double payment of benefits to an employee when it held that to the extent benefits are attributable to employment with USX, they may be deducted.

Of course, this court may not overrule the Fund's interpretation of the Plan language unless the administrator's reading may be said to be arbitrary and capricious.  That standard of review asks whether the Fund's interpretation of the Plan language is "reasonable."  *Firestone*, 489 U.S. at 111, 109 S.Ct. at 954.  An interpretation allowing an offset of $98.25 when only $4.91 was indirectly paid to a beneficiary by the employer is not reasonable.  It is an interpretation forbidden by the plain language of the Plan.  It may not, therefore, stand.[2]

The language of section 11 we have been addressing includes a paragraph added to the section in 1985.  The additional paragraph, which we previously set forth as integrated in section 11, reads:

All such benefits which are financed directly or indirectly by an Employing Company (including benefits paid from the Federal Black Lung Disability Trust Fund or a "second injury fund" established by state law to which an Employing Company is required to contribute by reason of law) shall be taken into account in the calculation of pension;  provided, however, that the deduction for such benefits paid from the Federal Black Lung

---

**2.**  The Plan acted arbitrarily in concluding that it indirectly financed the Special Fund benefits when it had not ascertained what percent it had financed.  Had it financed a substantial portion of them as opposed to approximately 5%, the situation would be very different.

Disability Trust Fund or a "second injury fund" shall be limited to the amount, to the extent reasonably determinable, of such benefits attributable to employment with an Employing Company....

Since all of the plaintiffs retired before 1985, we remand to the district court to determine whether their rights, vested under the pre-amendment language, would prohibit the offset of the full Kentucky Special Fund benefit.

### D.

### The Fund's Counterclaim

■ The district court awarded judgment for the Fund on its counterclaim for recoupment of overpayments. Section 8 of the Plan provides that "[t]he amount of the overpayment ... shall be deducted from any benefit payable under this Plan in whole or in part until such time as the overpayment is recouped." On appeal, the pensioners do not contest that the language of section 8 allows recoupment. They argue, however, that the following principles of law and equity prevent such recoupment: (1) the doctrine of mistake of law; (2) the Pennsylvania statute of limitations for contract claims; (3) laches; (4) estoppel; and (5) lack of standing. Because the first two arguments, mistake of law and statute of limitations, involve contract theories, we do not consider them. ERISA is governed by trust, not contract, law. *Firestone*, 489 U.S. at 110–12, 109 S.Ct. at 953–55.

### 1.

### Laches

■ The plaintiffs contend that the equitable doctrine of laches bars recoupment of the alleged overpayments.

Laches is an equitable doctrine, the elements of which are short of an estoppel, and the time in which it may ripen is short of the applicable period of limitation, and it is invoked in equity to defeat a tardy litigant on account of whose inexcusable delay, after possession of knowledge of the facts, his adversary, who has materially changed his situation, may defeat a recovery or defense because of the other's passiveness, if during the delay, and in reliance on such nonaction, a change has occurred in the situation and condition of the adversary to such an extent that to uphold the action and to grant the relief would put it beyond the power of the adversary to restore himself to his former situation or the court to place him in status quo.

*Klineline v. Head,* 205 Ky. 644, 266 S.W. 370, 372 (Ky.1924). Laches thus requires showing an unreasonable delay by one party which prejudiced the other party. The district court found that laches did not bar the counterclaim because "the Administrators acted quickly once they determined an overpayment had occurred." Because the definition of laches focuses on the inexcusable delay "after possession of the knowledge of the facts," the plaintiffs cannot successfully invoke the doctrine of laches as there is no evidence that the Fund delayed seeking recoupment once it learned of the possible overpayments.

### 2.

### Estoppel

■ The plaintiffs propose that the doctrine of estoppel by acquiescence should preclude recoupment of the prior payments. Equitable estoppel requires:

(1) conduct which amounts to false representation or concealment of material facts or at least which is calculated to convey the impression the circumstances are in a particular state that is inconsistent with the party's subsequent position; (2) the intention or expectation that such conduct shall influence the other party to act; and (3) knowledge, constructive or actual, of the true facts.

*City of Shelbyville v. Commonwealth of Kentucky,* 706 S.W.2d 426, 429 (Ky.App. 1986); *see also Lowenschuss v. Lowenschuss,* 396 Pa.Super. 531, 579 A.2d 377, 381 (Pa.Super.1990). Equitable estoppel requires that there be more than a change of position detrimental to the other party; it requires an element of misrepresentation or deceit in inducing the other party to rely on the initial position. As there was no

false representation, the plaintiffs cannot claim equitable estoppel bars the counterclaim.

### 3.

### Standing

█ The plaintiffs argue that the district court erred in awarding judgment on the counterclaim because the Fund did not have standing to bring the counterclaim under 29 U.S.C. § 1132. A civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3). Section 1132 is essentially a standing provision to be construed narrowly. *Gulf Life Ins. Co. v. Arnold,* 809 F.2d 1520 (11th Cir.1987). The Fund contends that it has standing to bring its counterclaim as a fiduciary seeking to enforce the terms of the Plan pertaining to workers' compensation offsets.

Section 8 of the Plan expressly permits recoupment for overpayment. Because the Plan provides for recoupment, the Fund has standing as it seeks "to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3)(B)(ii). This court has held, in a case involving an employee's fraud on a fund, that the fiduciary may sue to collect for past overpayments. *Kentucky Laborers Dist. Council Health & Welfare Fund v. Hope,* 861 F.2d 1003 (6th Cir.1988). Thus, the district court did not err in allowing the Fund to bring its counterclaim.

### 4.

### Principles of Equity and Trust Law

Although the Plan language permits recoupment, this court is concerned with the possible inequitable impact recoupment may have on the individual retirees. The retirees submitted affidavits describing the hardship they would suffer if they were forced to pay back benefits which they had received and depended upon. We thus remand this case to the district court to consider whether, under principles of equity or trust law, relief is unwarranted.[3] We do not, by doing so, suggest implicitly or otherwise any particular outcome.

### III.

We REVERSE the findings of the district court that the Fund's interpretation of the language was not arbitrary and capricious and REMAND for a determination of whether the rights of the plaintiffs who retired prior to 1985 are affected by the 1985 amendment to section 11 of the Plan. The district court shall also determine what percentage of the plaintiffs' Special Fund benefits United States Steel has contributed in each year.

With respect to the counterclaim, the district court shall determine whether equity permits recoupment.

FEIKENS, Senior District Judge, concurring in part and dissenting in part.

I cannot join the majority. In dissent, I hold that the district court applied the appropriate standard of review and correctly found that the United States Steel Pension Fund's interpretation of the Pension Plan's offset provisions was neither arbitrary nor capricious. However, I would remand for further proceedings on the Pension Fund's

---

**3.** The district court may wish to consider *Thorn v. United States Steel & Carnegie Steel Pension Fund,* CV–P–1829–S (M.D.Ala.1983). In *Thorn,* the court held that under trust law recovery of an overpayment by a trustee will not be allowed where the beneficiary, in reliance on the correctness of the amount of benefits, changes his position so that it would be inequitable to compel him to make restitution. Restatement (Second) of Trusts § 254, Comment e. Whether repayment would be inequitable depends on the beneficiary's disposition of the money which he was overpaid, the amount of the overpayment, the nature of the mistake made by the administrator, the amount of time which has passed since the overpayment was made, and the beneficiary's *total amount of income and the effect* recoupment would have on that income. *Thorn,* CV–P–1829–S at 3 n. 6 (citing III Scott on Trusts § 254.1 at 2187).

counterclaim for recoupment of over-payments.

As retirees of United States Steel ("USS"), appellants are covered by a USS pension plan ("the Plan") which gives them both a contributory and a non-contributory pension, but subjects the latter to a workers' compensation offset provision [1] designed to prevent "double-dipping," *i.e.*, the receipt of regular pension benefits from USS and the receipt also of employer-financed workers' compensation benefits for disabling injuries. In 1986, the Pension Fund notified appellants that their non-contributory pensions would be reduced by that portion of appellants' Special Fund benefits "attributable to appellants' employment with USS."

All appellants receive Special Fund benefits in a two-part payment. The first part—comprising twenty-five percent of the total payment—is paid directly by USS. Appellants do not dispute the Pension Fund's right to offset this part against their pensions. The second part—which comprises seventy-five percent of the total payment—is paid by the Special Fund. At issue here is whether this latter payment is subject to offset under the terms of the Plan, and if so, to what extent.

The Pension Fund interprets the Plan as requiring the reduction of pensions by that percentage of Special Fund benefits attributable to employment with USS. For example, if seventy-five percent of a pensioner's career was spent at USS, the Pension Fund will offset seventy-five percent of his Special Fund payment against his non-contributory pension, irrespective of USS' actual contribution to the Special Fund on behalf of that pensioner.

The Pension Fund arrived at its present interpretation of the Plan in 1986, when Anthony Kuchta ("Kuchta"), the Pension Fund's new case supervisor, learned from the Special Fund Administrator that Kentucky Special Fund benefits were financed by special employer taxes. Kuchta believed that USS' indirect financing of the Kentucky Special Fund required the Pension Fund to offset some portion of Special Fund payments against the non-contributory pensions of USS retirees. He based this conclusion on two offset provisions contained in the USS Pension Plan—Sections 3.10 and 11—and on the historical application of those provisions to Federal Black Lung Benefits.

Section 3.10 of the Plan's Non–Contributory Pension Rules has been in effect since 1976. It provides that:

> Any amount paid to or on behalf of any participant on account of injury or occupational disease incurred in the course of his employment by an Employing Company or any other employer causing disability in the nature of a permanent disability *that is paid directly or indirectly* by an Employing Company [2], whether pursuant to workmen's compensation, occupational disease or similar statutory law ..., shall be deducted from or charged against ... [the participant's non-contributory pension].... (emphasis added).

Section 11 of the Plan's General Provisions has also been in effect since 1976. In its original form, it provided that:

> Notwithstanding anything to the contrary contained in this Plan, workers' compensation, occupational disease benefits and other similar benefits payable with respect to a disability in the nature of a permanent disability will be taken into account in the calculation of pension *only if such benefits are paid directly or indirectly by an Employing Company* (emphasis added).

For several years the Pension Fund interpreted Sections 3.10 and 11 as requiring the offset of federal Black Lung benefits since those benefits were financed by special employer taxes and thus indirectly financed by USS. Accordingly, the Pension Fund reduced monthly non-contributory pension benefits by the *entire* amount of Federal Black Lung benefits received by retirees.

---

**1.** Although the Plan's offset provisions are not limited to workers' compensation awards, those are the only offsets at issue here.

**2.** An "Employing Company" is defined in Rule 1.1 as USS, its satellites and subsidiaries.

In the early 1980's a USS pensioner named Harry Teer challenged the offset of Federal Black Lung benefits against his non-contributory pension and filed suit in the United States District Court for the Northern District of Alabama. *Teer v. United States Steel and Carnegie Pension Fund*, No. CV 82–P–2379–S (N.D.Ala. May 9, 1983). In *Teer*, Judge Pointer ruled that the Plan required the offset of Federal Black Lung benefits against the pension, but only to the extent that such benefits were attributable to USS employment. He remanded the case to the Pension Fund to determine what percentage of Teer's career had been spent in USS mines.

The Pension Fund accepted this ruling and amended Section 11 to reflect the same. Since August 1, 1985, Section 11 has contained this additional paragraph:

All such benefits which are financed directly or indirectly by an Employing Company (including benefits paid from the Federal Black Lung Disability Trust Fund or a "second injury fund" established by state law to which an Employing Company is required to contribute by reason of law) shall be taken into account in the calculation of pension; provided, however, that the deduction for such benefits paid from the Federal Black Lung Disability Trust Fund or a "second injury fund" shall be limited to the amount, to the extent reasonably determinable, of such benefits attributable to employment with an Employing Company.

Based on these provisions, Kuchta determined that the Pension Fund was required to offset appellants' Kentucky Special Fund benefits since these benefits were financed "indirectly" by USS by way of special employer taxes. He also determined that the Pension Fund's failure to offset these benefits prior to 1986 was mere oversight and not the result of a conscious Fund policy.[3] He therefore informed appellants that such offsets would occur in the future, and that the past failure to offset resulted in overpayments of

pension benefits which the Pension Fund was required to recoup under Section 8 of the Plan.

Appellants contend that the district court erred in applying the arbitrary and capricious standard of review to the Pension Fund's interpretation of the Plan. In *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990), we held that a district court should review a plan administrator's interpretation of a plan under the arbitrary and capricious standard whenever the plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

In this case, the Plan gives the Pension Fund such discretion. Section 7.1(a) of the Pension Rules provides that the Pension Fund "shall administer these Pension Rules and shall decide all questions arising out of and relating to these Pension Rules." Section 7.7 states that "The decision of the [Pension Fund] shall be final and conclusive as to all questions of interpretation and application of these Pension Rules and as to all other matters arising in the administration thereof." In *Davis*, we held that substantially similar language gave the plan administrator great discretion to interpret the language of the Plan. *Id.* at 694. Thus, the district court properly applied an arbitrary and capricious standard of review to the Pension Fund's interpretation of the Plan.

Is the Pension Fund's interpretation of the Plan's offset and recoupment provisions arbitrary and capricious? Without a showing of internal inconsistency or bad faith or some other ground for calling the Pension Fund's determination into question, the arbitrary and capricious standard demands affirmance. *Davis*, 887 F.2d at 695. Moreover, where both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' in-

---

**3.** The Pension Fund apparently did not discover that the Kentucky Special Fund was financed by way of special employer taxes until 1986 when

Kuchta spoke with the Administrator of the Special Fund.

terpretation must be allowed to control. *Cook v. Pension Plan For Salaried Employees*, 801 F.2d 865, 870 (6th Cir.1986). So long as the plan administrator's interpretation is rationally related to a valid plan purpose and is not contrary to the plain language of the Plan, it will be upheld. *Id.* Courts apply this limited scope of review in order to avoid "excessive judicial interference with plan administration." *Id.*

The precise issue before us is whether the Pension Fund's interpretation of Sections 3.10 and 11 is rationally related to a valid Plan purpose and not contrary to the plain language of the Plan. I believe it is.

First, the Pension Fund's interpretation of the Plan is rationally related to the policy against double-dipping. By offsetting that portion of Special Fund benefits attributable to USS employment, the Pension Fund insures that USS retirees do not receive the equivalent of two pensions because of their employment with USS.

The Pension Fund's interpretation of the Plan does not contravene the plain language of the Plan. Section 3.10 of the Plan provides that pensions shall be reduced by "any amount ... that is paid directly or indirectly" by USS on behalf of pensioners pursuant to workmen's compensation, occupational disease, or similar statutory law.

In its opinion, the majority states that USS contributes only a small portion of the benefits received by its retirees. The opinion refers to retiree Vernon Asbridge as an example. The majority says Asbridge receives $98.25 per week from the Special Fund, but that USS contributes only $4.91 of that payment. The majority then continues, "An interpretation allowing an offset of $98.25 when only $4.91 was indirectly paid into the Fund by the employer is not reasonable." It appears that the majority concludes that other than the $4.91 payment, $93.34 came from some source other than USS. It would be unconscionable for USS to offset $93.34 against Asbridge's retirement if it did not pay this amount into the Fund. The majority does not explain from where this money came. The Special

Fund Administrator sought to offset this amount because USS had paid it into the Special Fund. I readily agree that if the source of this amount was not USS, then it would certainly be unreasonable to allow that amount to be taken as an offset. It appears that the majority must conclude that other employers are making payments into the Fund from which Asbridge receives his benefits.

The Pension Fund can also reasonably contend that USS indirectly pays appellants' Special Fund benefits to the extent those benefits are attributable to employment with USS. Because an appellant's entitlement to Special Fund benefits is based on his work in Kentucky coal mines, the Pension Fund can rationally claim that a particular appellant's entitlement is proportionally related to the percentage of his mining career spent at USS.

The Pension Fund's interpretation of Section 3.10 is supported by Judge Pointer's decision in *Teer, supra,* and by the amendment to Section 11 of the Plan. In *Teer,* Judge Pointer ruled that USS could not reasonably claim to "indirectly" finance all of Teer's Federal Black Lung benefits because other coal mining companies contributed to the federal trust fund that paid those benefits. Thus, Judge Pointer held that USS's indirect financing of Teer's federal benefits was limited to that portion of benefits attributable to Teer's years of service with USS. That limitation is now explicitly stated in Section 11.

The Pension Fund now seeks to offset Kentucky Special Fund benefits in a manner consistent with Judge Pointer's ruling and with the amended language of Section 11. As such, the Pension Fund's interpretation of the Plan seeks to effectuate a valid Plan purpose—the policy against double-dipping—and does not contravene the plain language of the Plan. Accordingly, it must be upheld. *Cook,* 801 F.2d at 870.

It has been argued, however, that even if the Pension Fund's interpretation of the Plan is supported by the Pointer decision and the subsequent amendment to Section 11, the Pension Fund's attempt to recoup overpayments made prior to that amend-

ment is not justified since Section 3.10 and the pre-amended version of Section 11 do not clearly define the scope of indirect disability benefits subject to offset. This argument attributes too much weight to Section 11.

By its very terms, Section 11 contains language of limitation, not empowerment. As such, it cannot empower the Pension Fund to make offsets it is otherwise unable to make. The Pension Fund's power to make offsets is found in Section 3.10, a provision that has been on the books since 1976, and that requires the Pension Fund to reduce pensions by amounts that USS "indirectly" pays pensioners through state-sponsored, employer-financed disability benefits. Section 11, in its amended form, merely limits the permissible scope of such offsets to the percentage of benefits attributable to USS employment. Until the amendment of Section 11, the precise scope of the Pension Fund's offset powers may have been unclear, but they were in no way expanded by the amendment.

Accordingly, I conclude that it is neither arbitrary nor capricious for the Pension Fund to recoup overpayment made to appellants prior to the Section 11 amendment, so long as Section 3.10 or a substantially similar provision was contained in the Plan at the time of the overpayments.

Having found that the Fund's recoupment rights are not limited by law, I do not foreclose the possibility that they are curtailed by equity. As a trustee of the Plan, the Pension Fund is bound by the equitable principles that govern trusts. Those principles allow a trustee or administrator of a trust to recoup overpayments to a beneficiary even if the excess payment was the product of unilateral mistake on the part of the trustee. *Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1354 (D.C.Cir.1982); *In re Nirdlinger's Estate*, 331 Pa. 135, 200 A. 656, 659 (1938); *Foscue v. Lyon*, 55 Ala. 440, 457 (1876); *Restatement of Trusts*, § 254 (1959); *III Scott on Trusts*, § 254 (3d Ed. 1967). However, recovery is precluded if the beneficiary, in reliance on the correctness of the amounts of benefits, changes his position so that it would be inequitable

to compel him to make restitution. *Thorn v. United States Steel and Carnegie Pension Fund*, CV–P–1829–S, slip op. at 3 n. 6 (M.D.Ala.1983), citing *Restatement (Second) of Trusts § 254, comment e.*

Because we cannot determine, from the record before us, whether or not each appellant detrimentally relied on the Pension Fund's past failure to offset Special Fund benefits against his pension, I join the majority in remanding the case to the district court for specific findings on this issue. If the district court finds that a particular appellant did change his position in reliance on the correctness of his pension benefits, the Pension Fund should not be allowed to recoup overpayments from that appellant.