**ATMOSPHERE HOSPITALITY MANAGEMENT SERVICES, LLC, Plaintiff,**

v.

**ROYAL REALTIES, LLC, Mashka, LLC, and Ieshula Isahksi, Defendants.**

Case No. 14–10299.

United States District Court,
E.D. Michigan,
Southern Division.

Signed June 26, 2014.

Atmosphere Hospitality Management Services, LLC, pro se.

Steven Z. Cohen, Joshua A. Lerner, Cohen, Lerner, Royal Oak, MI, for Defendant.

*OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISQUALIFY COUNSEL, STAYING CASE, AND AUTHORIZING IMMEDIATE APPEAL*

DAVID M. LAWSON, District Judge.

Before the Court is a motion by the defendants to disqualify Miller, Canfield, Paddock and Stone, the law firm that is representing the plaintiff in this case. Miller Canfield represented defendant Royal Realties, LLC in the summer of 2012 to give advice on labor and corporate matters relating to the negotiation of a management agreement for a large hotel the defendant owned. Although the first negotiations were not successful and the agreement fell through, Royal found another potential partner in plaintiff Atmosphere Hospitality Management Services, LLC. A management agreement was signed, and Miller Canfield continued to provide labor advice to both Royal and Atmosphere. Miller Canfield formally terminated its representation of Royal in August 2013. And when a dispute over the management agreement arose between Atmosphere and Royal in January 2014, Miller Canfield sided with Atmosphere and filed the complaint in this lawsuit on its behalf.

Royal accuses Miller Canfield of obtaining confidential information during the period Miller Canfield represented Royal and using it against Royal in this case, all without its consent. That conduct is plainly prohibited by Michigan Rule of Professional Conduct 1.9(c), although the charge in this case is dubious. But Rule 1.9(a) bars a lawyer from appearing in opposition to a former client on a matter that is "substantially related" to the earlier representation where the interests are adverse, unless the client consents. The Sixth Cir-

cuit has given a broad reading to that phrase—broad enough to encompass Miller Canfield's conduct. The case is close, but the Court believes disqualification is called for here.

## I.

In 2011, Royal purchased out of bankruptcy the 778–room hotel located in Dearborn, Michigan, formerly known as the Dearborn Hyatt Hotel. At that time, the Hyatt Corporation managed the hotel and employed over 200 employees. In May 2012, Hyatt gave notice under its management agreement that its last day of operations at the hotel would be October 31, 2012. Royal approached Miller Canfield attorney Christopher Trebilcock to ask for advice about certain labor issues under the National Labor Relations Act, the Labor Management Relations Act, and the Employee Retirement Income Security Act (ERISA) arising from Hyatt's termination of the agreement. Trebilcock Aff., dkt. # 53–2, at ¶ 3.

On July 16, 2012, Royal retained Miller Canfield to represent it with regard to "general corporate and labor matters" concerning the hotel's operations. Trebilcock Aff. ¶ 7; engagement letter, dkt. # 53–2, at 13. From July 17, 2012 through September 18, 2012, Miller Canfield furnished labor and employment advice to Royal relating to Hyatt's termination of the operating agreement, union negotiations with Unite HERE!—Local 24, and labor issues arising out of Royal's negotiations for a new management agreement. Trebilcock Aff. ¶ 8.

In August 2012, Royal began negotiating with the Carlson Rezidor Hotel Group to replace Hyatt as the operator of the hotel. Ferguson, Schetelich & Ballen, P.A., a law firm located in Baltimore, Maryland, represented Royal in direct negotiations with the Carlson Group. Mr. Trebilcock and members of Miller Canfield's corporate law department, including Richard Walawender, Malgorzata Portega–Bill, and Elizabeth Sanders, provided limited advice to Royal on corporate and labor issues that cropped up during those negotiations. Richard A. Walawender Aff., dkt. # 53–3, at ¶¶ 4–6. The work required Miller Canfield attorneys to review the draft management agreement with Carlson and make proposed revisions. Royal was particularly concerned about whether the agreement would create potential pension withdrawal liability under ERISA. Trebilcock Aff., dkt. # 53–2, at ¶ 9.

On September 13, 2012, Michael Hourigan, a lawyer at Ferguson, Schetelich & Ballen, contacted Trebilcock and asked him to review another draft of the proposed management agreement. The email read:

Chris,

We represent Royal Realties, LLC regarding the Radisson Dearborn Hotel. We are in the process of negotiations related to the Management Agreement for the property. We understand you are advising Royal Realties from a labor and employment perspective. I have attached the most recent version of the Management Agreement, which we have just sent to Carlson's in-house counsel. We wanted to forward the current version of the Agreement to you for any input regarding the labor and employment issues.

Email from Hourigan to Trebilcock, dkt. # 53–2 at 17. Trebilcock informed Hourigan that the proposed draft management agreement would help insulate Royal from potential withdrawal liability under ERISA.

In late September 2012, the deal with Carlson fell apart. Nearly one month later, Royal entered into negotiations with

Atmosphere to manage the hotel. On October 24, 2012, Royal and Atmosphere executed a property management agreement. No lawyer at Miller Canfield provided any legal advice to Royal regarding the negotiation, drafting, or implementation of the management agreement between Royal and Atmosphere. Trebilcock Aff. ¶ 14; Walawender Aff. ¶ 10.

After Atmosphere began managing the hotel, Atmosphere approached Miller Canfield for legal advice "with respect to labor relations and contract negotiations with UNITE HERE Local 24 and the Operating Engineers." Letter from Miller Canfield to Royal, dkt. # 42 at 23. Miller Canfield contacted Royal on October 26, 2012, advised it of a potential conflict of interest, and requested its consent to the representation because it did not believe that the law firm's representation of Atmosphere would adversely affect Miller Canfield's relationship with either client. Both parties gave their consent to the potential conflict. However, Royal did not give blanket or general consent with respect to any other matter.

Between October 26, 2012 and March 13, 2013, Miller Canfield had no contact with any representative of Royal. On March 13, 2013, Mr. Trebilcock provided Royal with an update on the status of the labor negotiations with Local 24. Walawender Aff. ¶ 6. In the meantime, in January 2013, Atmosphere and Royal signed a second addendum to the management agreement. Royal stopped paying Miller Canfield's invoices, and Miller Canfield formally terminated its attorney-client relationship with Royal on August 14, 2013. Miller Canfield thereafter represented Atmosphere in its negotiations with Royal concerning the hotel's liquor license, which resulted in two more addenda to the management agreement.

The relationship between Atmosphere and Royal has since degenerated. On January 22, 2014, Royal sent a letter to Atmosphere notifying it that Royal was terminating the management agreement. On January 23, 2014, Miller Canfield filed a nine-count complaint on Atmosphere's behalf for breach of contract, fraudulent inducement, tortious interference with contract, defamation, and unjust enrichment. The parties have filed several motions for temporary and interim relief, several of them characterized as emergencies, and the Court has held hearings and conferences over the months that the case has been pending. The Court expedited discovery and scheduled a trial for August 18, 2014 on the validity and enforceability of the parties' management agreement and the various addenda. However, on May 13, 2014, the defendants filed a motion to disqualify counsel for the plaintiff. The Court held a hearing on June 23, 2014; neither side offered any evidence beyond the attachments to the motions papers.

## II.

### A.

The defendants argue that Miller Canfield should be disqualified because it obtained confidential information when it represented Royal on labor relations negotiations involving two unions and during the negotiation of the management contract with the Carlson Rezidor Hotel Group. As evidence, Royal points to the allegation in paragraph 10 of the complaint alleging that the Carlson Group pulled out of the negotiations within a couple weeks after it appeared that a management agreement had been reached.

Royal insists that the information must have come from confidential facts disclosed during Royal's relationship with Miller Canfield, but, as the plaintiff points out, the information was hardly confidential, as

it was widely reported in trade publications. Royal insists nonetheless that it provided confidential information to Miller Canfield concerning its "goals and needs regarding the management of the hotel." Royal believes it will be disadvantaged if Miller Canfield is allowed to represent its opponent in this litigation over the termination of the later management agreement, and therefore Miller Canfield should be disqualified.

■ Courts have the inherent authority to prevent individuals from practicing before them. *D.H. Overmyer Co., Inc. v. Robson,* 750 F.2d 31, 33 (6th Cir.1984). "The power is one which ought to be exercised with great caution, but which is, we think, incidental to all Courts, and is necessary for the preservation of decorum, and for the respectability of the profession." *Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824) (Marshall, C.J.).

■ "Unquestionably, the ability to deny one's opponent the services of capable counsel, is a potent weapon. Confronted with such a motion, courts must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice." *Manning v. Waring, Cox, James, Sklar and Allen,* 849 F.2d 222, 224 (6th Cir.1988). "A court should only disqualify an attorney 'when there is a reasonable possibility that some specifically identifiable impropriety actually occurred.'" *Moses v. Sterling Commerce (America), Inc.,* 122 Fed.Appx. 177, 183–84 (6th Cir.2005) (quoting *Kitchen v. Aristech Chem.,* 769 F.Supp. 254, 257 (S.D.Ohio 1991)). A state's ethics rules are appropriate standards against which to measure the propriety of an attorney's conduct for the purpose of determining whether a lawyer should be disqualified in a particular case. *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Alticor, Inc.,* 466 F.3d 456, 457–58 (6th Cir.2006), *vacated on other grounds,* 472 F.3d 436 (6th Cir.2007) (citing *Evans & Luptak, PLC v. Lizza,* 251 Mich.App. 187, 650 N.W.2d 364, 368–69 (2002)).

In their brief, the defendants argue that the governing ethics rule is Michigan Rule of Professional Conduct 1.7, but they backed off that position at oral argument, and appropriately so. Miller Canfield no longer represents Royal, its former client. Rule 1.7 governs a lawyer's professional responsibility concerning *current* clients; Rule 1.9 governs a lawyer's professional responsibility concerning *former* clients. Rule 1.9 governs here.

■ Michigan Rule of Professional Conduct 1.9(a) states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Mich. R. Prof'l Conduct 1.9(a). Michigan Rule of Professional Conduct 1.10 imposes this duty upon the entire law firm: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[ ] 1.9(a)...." Thus, the duties of loyalty and confidentiality "apply only to matters in which the new client's interests qualify as both adverse to those of the former client *and* substantially related to the subjects of the attorney's former representation." *Alpha Capital Mgmt., Inc. v. Rentenbach,* 287 Mich.App. 589, 604, 792 N.W.2d 344, 356 (2010). The parties do not dispute that Miller Canfield's representation of Atmosphere is adverse to the inter-

ests of Royal, its former client. However, Miller Canfield argues that its representation of Atmosphere is not substantially related to the matter for which it represented Royal.

The Sixth Circuit recently had the opportunity to "consider the meaning of 'substantially related.'" *Bowers v. Ophthalmology Group,* 733 F.3d 647, 649 (6th Cir. 2013). Construing the nearly identical Kentucky Rule of Professional Conduct 1.9 (and taking guidance from the commentary), that court suggested that "'[m]atters are "substantially related" ... if they involve the same transaction or legal dispute or if there is otherwise a substantial risk that confidential factual information *as would normally have been obtained* in the prior representation would materially advance the client's position in the subsequent matter.'" *Id.* at 652 (quoting Ky. S.Ct. R. 3.130 (1.9 cmt. 3)).

■ The defendants here cannot postulate with any credibility that the present lawsuit over the management agreement is "the same transaction or legal dispute" as the failed negotiations with the Carlson Group. Although the talks with the Carlson Group involved the same hotel and concerned the same general management services, the parties were different and the matter concluded when the Carlson Group pulled out. Under *Bowers,* Atmosphere's present dispute with Royal can be substantially related to the Carlson Group matter only if there is a likelihood that the attorney acquired confidential information in the prior representation that could be relevant to the present lawsuit. Michigan's interpretation of its own Rule 1.9(a) is consistent:

> The lawyer might have acquired the substantially related information in issue if (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b)

the information is of such a character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship. *Alpha Capital Mgmt.,* 287 Mich.App. at 606, 792 N.W.2d at 356–57 (internal quotation marks, citations, and alterations omitted).

■ The defined scope of Miller Canfield's prior representation of Royal focused on labor and employment issues and general corporate advice. The defendants broadly allege that Miller Canfield obtained confidential information about Royal's "goals and needs regarding the management of the hotel." Defs' Mot. at 3, ¶ 5. The defendants have offered no specific allegations about how Royal's management "goals and needs" are relevant to whether Royal breached the management agreement with Atmosphere by failing to provide operating funds, failing to secure a liquor license for the hotel, or whether Royal properly terminated the management agreement. But the former client has no obligation to articulate with any specificity the confidential information it seeks to protect when challenging its former lawyer's appearance in opposition to it. *See Bowers,* 733 F.3d at 652 (observing that "[a] concern to protect a former client's confidential information would be self-defeating if, in order to obtain its protection, the former client were required to reveal in a public proceeding the particular communication or other confidential information that could be used in the subsequent representation" (quoting Restatement (Third) of the Law Governing Lawyers § 132 cmt. d(iii) (2000))). Instead, Royal need only show that information likely disclosed in the prior engagement was confidential.

In this case, when giving advice about union negotiations and attempting to protect against withdrawal liability under

ERISA, it is likely that Royal would have revealed information about its business structure and decision makers, its finances, the operations of the hotel, concerns about costs, expenses, and profitability, financial strengths and weaknesses, concerns over the cost and quality of its workforce, unfunded liabilities, and its plans for the operation of the hotel in the future. Atmosphere's present lawsuit alleges that Royal fraudulently induced Atmosphere to enter into the management agreement and four addenda and breached the management agreement by failing to fund the hotel and provide a liquor license, and by prematurely terminating the management agreement. It is conceivable that information acquired by Miller Canfield during its representation of Royal could be helpful in fashioning targeted discovery inquiries, exploiting weaknesses in settlement discussions, and addressing the merits of the fraud allegations.

The Court likely will be required to construe the contractual terms in the management agreement allocating responsibilities for union or employee salaries, benefits, and pensions. *See, e.g.,* Management Agreement, dkt. # 6–2, at ¶¶ 2.05 ("Employees"), 2.13 ("Taxes, Union, and Government Fees"), and 3.01 ("Insurance"); *see also* Second Addendum, dkt. # 10–4. Although neither party disclosed the draft management agreement with the Carlson Group, some of the terms in that agreement probably were imported into the current agreement. The current management agreement came to fruition at the eleventh hour and only after the negotiations with the Carlson Group fell apart; therefore, it is fair to conclude that some of its language was imported into the agreement with Atmosphere. Even if that is not the case, Miller Canfield no doubt learned of Royal's concerns about the cost and quality of its workforce and its unfunded pension liabilities—knowledge that it could unfairly exploit to Atmosphere's advantage when presenting arguments to this Court about the intent of the parties when they agreed to the labor and employment provisions in the management agreement. In fact, issues concerning pension, wage, and union liabilities are already hovering in this case. The plaintiff's motion for a preliminary injunction raised concerns that pensions would go unfunded if Atmosphere is terminated as the manager of the hotel. Dkt. # 6 at 25. At oral argument on that motion, Miller Canfield raised concerns about Atmosphere's potential liability under the Worker Adjustment and Retraining Notification Act (WARN). Tr., 02/10/2014, at 20–21. And at a June 17, 2014 hearing on the defendants' motion to compel, counsel for the defendants informed the Court that health insurance for hotel employees may have gone unpaid and there are $90,000 in unpaid union dues. Tr., 06/17/2014, at 7. If those liabilities continue to go unpaid, it is not beyond the realm of possibility that third-parties may bring claims directly related to the parties' union, labor, and pension liabilities—liabilities concerning which Miller Canfield has now represented both sides in this matter. The parties have identified this very possibility with the Court. *Id.* at 14.

Even greater concern arises from the possibility of the case progressing to the damages phase. The management agreement contains language triggering an obligation by Royal to pay damages and expenses to Atmosphere if there is a wrongful or premature termination of Atmosphere as the manager. Knowledge of Royal's business practices could be useful when attempting to allocate and assign responsibility for expenses. Royal also has obtained a mortgage recently on the hotel property that might make collection difficult, if Atmosphere ever obtains a

judgment. Inside knowledge of the business structure and identity of Royal's members could provide Atmosphere an advantage in tracking assets. " '[T]he representations are substantially related if they involve the same client and the matters or transactions in question are relevantly interconnected or reveal the client's pattern of conduct.' " *Bowers*, 733 F.3d at 652 (quoting *Koch v. Koch Indus.*, 798 F.Supp. 1525, 1536 (D.Kan.1992)).

That conclusion is reinforced by the result in *Bowers*. In that case, the plaintiff brought gender discrimination claims against her former ophthalmology group after it had expelled her as a partner. The law firm that represented the defendant had represented Bowers previously in an attempt to establish a separate ophthalmology practice in another city, and the law firm represented all the group's partners when they were considering the expulsion of a male partner. The *Bowers* majority held that the representation dealing with the new ophthalmology practice was substantially related to Bowers's Title VII case against her former partnership because it was likely that Bowers "would discuss her confidential motivations for" establishing a separate practice; the law firm "would have obtained confidential information regarding Bowers's relationship with her [former] partners"; and "[i]t seems equally likely that an attorney in this type of representation would want to understand whether there could be backlash from the partnership towards her client for establishing an additional, separate practice." *Id.* at 653. The court found that the information, had it been disclosed, could be relevant to the defense of the Title VII claim that Bowers was not an employee and therefore not eligible for Title VII's protections. The court held, therefore, that the law firm's previous representation of Bowers in her aborted attempt to open a separate refractive surgery practice in a remote city was substantially related to her discrimination claim against her former partnership, and it disqualified the defendants' lawyers.

The view of this case from 20,000 feet does not favor Miller Canfield: the law firm represented a hotel owner that, under the press of time, was attempting to secure a management company to run (and maybe even purchase) its 778–room hotel; but the law firm sued the hotel owner two years later on behalf of another management company alleging that the hotel owner fraudulently induced it to sign the management agreement. One might easily conclude that "the subsequent representation can be justly regarded as a changing of sides in the matter in question." Mich. R. Prof. Cond. § 1.9 cmt. It is true that when one examines the details of the prior representation, the relationships among the parties, and the subsequent events, subtleties emerge. The scope of Miller Canfield's engagement with Royal was narrow, and much of the information that concerns the defendants is public knowledge. But when viewed through the lens of *Bowers*, the picture remains the same. The present lawsuit must be considered substantially related to Miller Canfield's earlier representation of Royal.

This conclusion might not have been obvious to Miller Canfield when it filed the present lawsuit for Atmosphere, but the issue should have been apparent. The Michigan authorities counsel that "[i]n case of doubt whether confidential information relating to the former representation could be used to the disadvantage of the former client, a lawyer should decline representation." Mich. Eth. Op. RI–192, 1994 WL 154952 (Mich. Prof. Jud. Eth. Committee 1994) (citing *Gen. Electric Co. v. Valeron, Corp.*, 608 F.2d 265 (6th Cir. 1979)).

## B.

■ The plaintiff argues that even if a conflict of interest exists, Royal has consented to it by waiting for five months after the lawsuit was filed to raise it. The plaintiff argues that the doctrine of laches applies. "Laches is an equitable doctrine ... invoked in equity to defeat a tardy litigant on account of whose inexcusable delay, after possession of knowledge of the facts, his adversary, who has materially changed his situation, may defeat a recovery or defense because of the other's passiveness...." *Finnerty v. Wireless Retail, Inc.*, 624 F.Supp.2d 642, 665 (E.D.Mich. 2009) (quoting *Wells v. U.S. Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1250 (6th Cir.1991)). The plaintiff says that both elements of the defense—(1) unreasonable delay in asserting one's rights; and (2) prejudice to the defending party—are present here.

The defendants' explanation that the conflict motion was filed soon after they obtained new counsel is weak. The previous lawyers representing the defendants are competent and surely would have recognized a potential conflict of interest if there were truly a disadvantage to be suffered. It would appear to the casual observer that the motion to disqualify was filed at a time that would maximize the tactical advantage gained by deploying this "potent weapon." *Manning*, 849 F.2d at 224. But matters of conflict between lawyers and clients are serious matters, and consent will not be lightly inferred. Acquiescence generally will not amount to a client's consent to a conflict of interest. *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 418 (6th Cir.2008). The delay in this case, although troublesome, is not disqualifying. The plaintiff no doubt will be prejudiced by having to change lawyers at this stage of the litigation. But the Court has discretion to permit new counsel time to prepare, even if it means postponing the upcoming trial in August. The plaintiff continues to manage the hotel, and will remain as manager until the Court rules otherwise.

## C.

■ Finally, the Court appreciates the impact on the plaintiff that a disqualification order will have in this litigation. The order is not final, and it does not qualify for an immediate appeal under the collateral order doctrine. *See Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 431, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) (order disqualifying counsel in civil case not immediately appealable under collateral order doctrine). However, as mentioned above, the question whether the two matters are substantially related is a close one, and therefore the Court finds that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The question is "controlling" because it will determine the plaintiff's right to counsel of its choice, and therefore could "could materially affect the outcome of the case." *In re City of Memphis*, 293 F.3d 345, 351 (6th Cir.2002). There is substantial grounds for difference of opinion because it is not clear what information Miller Canfield may have obtained that could disadvantage the defendants. *Newsome v. Young Supply Co.*, 873 F.Supp.2d 872, 876–77 (E.D.Mich.2012) (quoting *City of Dearborn v. Comcast of Michigan III*, No. 08–10156, 2008 WL 5084203, at *3 (E.D.Mich. Nov. 24, 2008)). "An interlocutory appeal materially advances litigation when it 'save[s] judicial resources and litigant expense.'" *Id.* at 878 (quoting *West Tennessee Chapter of Associated Builders and Contractors, Inc. v. City of Memphis*, 138

F.Supp.2d 1015, 1026 (W.D.Tenn.2000)). An immediate appeal of this order, should the plaintiff desire one, will be permitted.

## III.

For the reasons discussed above, the Court finds that Miller Canfield's representation of the plaintiff in this case creates a conflict of interest, and the law firm must be disqualified. An immediate appeal is authorized.

Accordingly, it is **ORDERED** that the defendants' motion to disqualify counsel for the plaintiff [dkt. # 42] is **GRANTED.**

It is further **ORDERED** that the law firm of Miller, Canfield, Paddock, and Stone and each of its attorneys are disqualified from representing any party in this case.

It is further **ORDERED** that all proceedings in the case are **STAYED** for a period of thirty (30) days, until **July 28, 2014,** to permit the plaintiffs to obtain new counsel, or to allow any party to file a motion in the United States Court of Appeals for the Sixth Circuit for permission to appeal under Federal Rule of Appellate Procedure 5. *See* Fed. R.App. Pro. 4(a)(1)(A), 5(a)(2). If no such motion is filed within that time, the stay will be dissolved. If such a motion is filed, the stay will continue until the motion is resolved by the court of appeals.