Edgar ANDERSON, et. al., Plaintiffs,

v.

TELEDYNE INDUSTRIES, INC. Teledyne Monarch Rubber Division and Teledyne Monarch Rubber Hourly Pension Plan, Defendants.

No. 5: 91 CV 0990.

United States District Court, N.D. Ohio, E.D.

July 2, 1992.

---

**1310**

Paul Leslie Jackson, Roetzel & Andress, Akron, Ohio, Robert J. Tscholl, Roetzel & Andress, Canton, Ohio, John D. Morris, Alliance, Ohio, for plaintiffs.

Peter D. Post, Beth L. Silver, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Sheila M. Markley, James R. Blake, Day, Ketterer, Raley, Wright & Rybolt, Canton, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSION OF LAW

SAM H. BELL, District Judge.

### I. INTRODUCTION

The above-captioned matter was commenced by forty four plaintiffs approximately one year ago. The plaintiffs' complaint alleges failure of defendants to pay special early retirement benefits, and raises claims of breach of contract under the Labor Management Relations Act, breach of fiduciary duty and sundry violations of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.* The complaint seeks monetary damages as well as declaratory and injunctive relief. In short order, the defendants moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). On October 24, 1991, that motion was denied as to plaintiffs' claim for monetary damages and granted as to plaintiffs' claim to injunctive relief. (Docket # 20). All parties then moved for summary judgment. On the 11th of June, 1992, this court denied plaintiffs' motion and granted the defendants' motion as it related to counts one, three and four of plaintiffs' complaint. Count two, alleging wrongful denial of benefits actionable under § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), constitutes the plaintiffs' sole remaining claim. Accordingly, this cause came to trial before the bench on the 24th and 25th of June, 1992. The following findings of fact and conclusions of law, the product of that trial, are hereafter recited pursuant to Fed. R.Civ.P. 52(a).

## II. FINDINGS OF FACT

Both plaintiffs and defendants have stipulated to the following facts:

1. Teledyne Monarch Rubber is a division of Teledyne Industries, Inc., a wholly owned subsidiary of Teledyne, Inc. Teledyne Monarch Rubber manufactured various rubber products at its plant in Hartville, Ohio.

2. The Teledyne Monarch Rubber Hourly Pension Plan (the "Plan") is a pension benefit plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2) and a qualified plan within the meaning of Internal Revenue Code § 401(a).

3. Plaintiffs are former employees of Teledyne Monarch Rubber and participants in the Plan.

4. Plaintiffs were represented by the United Rubber, Cork, Linoleum and Plastic Workers of America International Union and its Local Union No. 99.

5. Teledyne Monarch Rubber is the plan sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

6. Under the terms of the Plan, Teledyne Monarch Rubber has the right to amend or terminate the Plan (Section 7.5).

7. On January 30, 1991, Teledyne Monarch Rubber notified the Union and employees of its intention to sell the assets of its plants in and around Hartville, Ohio and to close the plants permanently.

8. The Unions and Teledyne Monarch Rubber bargained beginning in January 1991 until June 10, 1991 concerning the effects of the plant closing.

9. As a result of the plant closing negotiations, the Company agreed that any employee who was eligible for retirement prior to July 1, 1991, was eligible for medical benefits upon retirement without regard to his or her retirement date.

10. Eligibility for the Special Early Retirement Benefit under the Plan was governed by Section 4.5 of the Plan.

11. The Plant Closing Agreement was negotiated by Teledyne Monarch Rubber and URW Local 99 prior to June 15, 1991 and it was ratified by the bargaining unit and signed by the Unions on August 26, 1991.

12. Paragraph 8 of the Plant Closing Agreement provides:

> 8. The Company and the Union agree that the Special Early Retirement Benefit shall be deleted from the Company pension plan as being unlawfully discriminatory.

13. Teledyne Monarch Rubber sold and/or closed its plants in and around Hartville, Ohio on June 16, 1991.

14. All the Plaintiffs were either 55 years of age or older or had 30 years of service at the time of the plant closing.

| Plaintiff | Service at Retirement | Age at Retirement |
|---|---|---|
| Edgar Anderson | 24 yrs | 55 |
| Keith Allen | 31 yrs 9 mos | 52 |
| Lacy Berry | 28 yrs 8 mos | 56 |
| Alonzo Berry | 33 yrs 2 mos | 55 |
| Stephen Bilbrey | 33 yrs 7 mos | 55 |
| John Biller | 28 yrs 2 mos | 56 |
| Carl V. Buhite | 19 yrs | 57 |
| Arnold Burley | 26 yrs 6 mos | 56 |
| Thomas Butler | 32 yrs 5 mos | 51 |
| Martin Carpenter | 29 yrs 6 mos | 59 |
| Martha M. Drake | 31 yrs 3 mos | 59 |
| Ben Dyer | 22 yrs 10 mos | 59 |
| Earl Daniel Jones | 28 yrs 9 mos | 60 |
| Charles Keen | 25 yrs 8 mos | 55 |
| Paul D. Keener | 36 yrs 3 mos | 56 |
| Robert Keener | 17 yrs 10 mos | 58 |
| John Ketron | 24 yrs 7 mos | 57 |
| Dale E. Kinsey | 25 yrs 8 mos | 62 |

| Plaintiff | Service at Retirement | Age at Retirement |
|---|---|---|
| Jimmie Kiser | 25 yrs 4 mos | 56 |
| Tyrus Logan | 31 yrs 11 mos | 51 |
| Paul L. Marshall | 33 yrs 3 mos | 54 |
| Forrest Phillips, Sr. | 18 yrs 7 mos | 58 |
| Louis Pinazza | 18 yrs | 57 |
| Mayford L Romine | 34 yrs 4 mos | 52 |
| Jim Rose | 28 yrs 7 mos | 56 |
| Betty Eller | 31 yrs | 61 |
| Francis Fankhauser | 19 yrs 10 mos | 61 |
| Robert Fausnight | 13 yrs 2 mos | 60 |
| Wayne Fertig | 31 yrs 9 mos | 59 |
| Edwin Fites, Jr. | 30 yrs 6 mos | 50 |
| Carl Fleischer | 32 yrs 5 mos | 52 |
| Donald Fulmer | 34 yrs 10 mos | 56 |
| Jessie Garrison | 28 yrs 8 mos | 60 |
| Donald Green | 7 yrs 5 mos | 64 |
| John Griggy | 36 yrs 5 mos | 55 |
| Junior Hawkins | 32 yrs 6 mos | 53 |
| Eli Hostetler | 17 yrs 10 mos | 62 |
| Everett Johnson | 30 yrs 1 mo | 55 |
| Lenora Rusbarsky | 18 yrs 2 mos | 59 |
| Joseph M. Schaeffer | 35 yrs 7 mos | 54 |
| Doris Scott | 28 yrs 7 mos | 60 |
| Richard C. Smith | 34 yrs 8 mos | 53 |
| Frank Stegh | 22 yrs 1 mo | 60 |
| Virginia Wilkinson | 23 yrs | 56 |

15. All Plaintiffs retired on or before June 1, 1991 under provisions other than Section 4.5.

16. Plaintiffs are currently receiving pension benefits from the Plan.

17. All of the Plaintiffs were successfully performing their jobs at the time when they retired.

18. The Teledyne Monarch Rubber Hourly Pension Plan is a separate plan from the Teledyne Continental Motors Pension Plan.

In addition to these stipulated facts, it is beneficial for this court to make additional findings to provide contour and context to the instant dispute. The plaintiffs herein, former Teledyne Monarch employees, seek benefits pursuant to a pension plan resulting from collective bargaining between Teledyne and the local union; to wit: The Teledyne Monarch Rubber Hourly Pension Plan. [hereinafter "the Plan"] Specifically, plaintiffs claim entitlement to "special early retirement benefits", a benefit which would approximately double the amount of income they are entitled to from the plan until they reach age 65 or the date their unreduced Social Security retirement benefits begin. The Plan provides, in pertinent part, the following:

A Participant may be retired *at the option of the Employer* or *under mutually satisfactory conditions as of the first day of any calendar month preceding his Normal Retirement Date.* A participant shall be deemed to have been retired under mutually satisfactory conditions, for the purposes of this Section 4.5, *only if the Employer has confirmed in writing its consent to his retirement.*

(Plan § 4.5). From 1982–1985 Teledyne issued a so-called "Bluebook", in fact a summary plan description (SPD), which characterized one's entitlement to the "special early retirement benefits" in the following manner:

*If you are retired under a Company initiated retirement, you are eligible to receive a special early retirement benefit.*

(Defendants' Exhibit G at 100).

After Teledyne announced its decision to cease its operation of the Hartville facilities in January of 1991, there were two immediate results. First, employees immediately began to contemplate their future finances. Second, the company and the union began to negotiate a plant closing agreement[1]. During the negotiations, the company intimated that it believed retired employees were not entitled to health insurance and other benefits after the expiration of the collective bargaining agreement. As noted above, this stance eventually changed. In light of the company's position, the union posted the following notice at the Hartville location:

## NOTICE

DUE TO THE MANY QUESTIONS THAT ARE BEING ASKED ABOUT RETIREMENT, WE HAVE TALKED TO URW GENERAL COUNSEL CHARLES ARMSTRONG AND PENSION AND INSURANCE DIRECTOR BOB LONG. UNDER OUR PRESENT AGREEMENT THOSE WHO ARE ELIGIBLE TO RETIRE BEFORE JUNE 15, 1991:

1. FIFTY FIVE (55) YEARS OLD AND TEN (10) YEARS SERVICE.

2. THIRTY (30) YEARS SERVICE.

3. SIXTY FIVE (65) YEARS OLD AND FIVE (5) YEARS SERVICE.

4. TEN (10) YEARS SERVICE OFF WORK ON SICK AND ACCIDENT FOR FIVE (5) MONTHS WHO ARE PERMANENTLY DISABLED.

THESE UNION MEMBERS PLEASE BE ADVISED TO RETIRE PRIOR TO JUNE 1, 1991. (DO NOT WORK IN JUNE. RETIRE EFFECTIVE JUNE 1, 1991).

WHEN YOU RETIRE BEFORE THE AGREEMENT ENDS, JUNE 15, 1991 WE FEEL YOU ARE ENTITLED TO HOSPITALIZATION COVERAGE AND LIFE INSURANCE PER OUR AGREEMENT.

TELEDYNE MONARCH DOES NOT AGREE WITH THIS.

THE COMPANY HAS AGREED EMPLOYEES WHO LEAVE AFTER APRIL 1, 1991 ARE ENTITLED TO EVERYTHING GAINED IN EFFECTS BARGAINING.

FRATERNALLY YOURS,

DARIS G. BOGGS
PRESIDENT URW LOCAL # 99

POSTED MARCH 6, 1991

(Plaintiffs' Exhibit 5) (emphasis in original) Disturbed by this and another similar posting, the company, at collective bargaining, told the union that it intended to issue the following posting to clarify the state of actual negotiations:

March 15, 1991

## NOTICE

TO: ALL HOURLY EMPLOYEES

Representatives of TMR and the URW are currently engaged in collective bargaining regarding the effects on the employees of the Company's decision to close and sell the facility. Effects bargaining is similar to normal contract negotiations: Both sides are required to bargain in good faith, but neither side is required to agree to demands of the other. Such negotiations, which may take several months, hopefully conclude with a plant closing agreement reflecting reasonable compromise by the parties.

The negotiations are in an early stage. Agreements at individual bargaining sessions are tentative and are subject to final settlement on the overall plant closing agreement. Thus, the Company was disturbed by the tone and content of the Union's recent notice suggesting final agreement on some issues and rejection of others. Please be advised the Union's

1. A collective bargaining agreement, covering the plaintiffs, was due to expire in June of 1991.

notice set forth proposals by the Union made during bargaining, not matters to which the parties have mutually agreed. For example, the Company's position is that active employees as of April 1, 1991 who are subsequently terminated by the Company will receive benefits under the plant closing agreement. This does not include employees who retire prior to the actual date of closing or those employees who continue work with the purchaser. **Moreover, the issue of insurance continuation could be modified, and there is presently no agreement about retiree insurance or other possible benefits.**

The company will continue to bargain toward a comprehensive plant closing agreement addressing the concerns of the employees, the Company and the Union. **We expect positions of the parties will change during the give and take of negotiations. It will be the plant closing agreement ultimately negotiated by the parties which will govern the benefits it provides, not piecemeal notices by the Union reflecting its bargaining proposals and inaccurate portrayal of the Company's responses.**

Sincerely,

TELEDYNE MONARCH RUBBER

Ken D. Smith
Executive Vice President

(Defendants' Exhibit FFF) (emphasis added). As a result, the union posted the following notice:

March 15, 1991

TO: ALL HOURLY EMPLOYEES

REPRESENTATIVES OF TMR AND THE LOCAL # 99 ARE CURRENTLY ENGAGED IN COLLECTIVE BARGAINING REGARDING THE EFFECTS ON THE EMPLOYEES OF THE COMPANY'S DECISION TO CLOSE OR SELL THE FACILITY. EFFECTS BARGAINING IS SIMILAR TO NORMAL CONTRACT NEGOTIATIONS. BOTH SIDES ARE REQUIRED TO BARGAIN IN GOOD FAITH. BUT NEITHER SIDE IS REQUIRED TO AGREE TO DEMANDS OF THE OTHER. SUCH NEGOTIATIONS, WHICH MAT TAKE SEVERAL MONTHS, HOPEFULLY CONCLUDE WITH A PLANT CLOSING AGREEMENT REFLECTING REASONABLE COMPROMISE BY THE PARTIES.

THE NEGOTIATIONS ARE IN AN EARLY STAGE. **AGREEMENTS AT INDIVIDUAL BARGAINING SESSIONS ARE TENTATIVE AND ARE SUBJECT TO FINAL SETTLEMENT ON THE OVERALL PLANT CLOSING AGREEMENT.**

THERE IS A MISUNDERSTANDING BETWEEN TMR AND LOCAL # 99 NEGOTIATIONS COMMITTEE AS TO THE AGREEMENT ON EMPLOYEES WHO QUIT OR RETIRE AFTER APRIL 1, 1991.

THE DISAGREEMENT IS THE LANGUAGE USED IN THE MARCH 12, 1991 POSTING.

DARIS G. BOGGS
PRESIDENT URW LOCAL # 99

(Defendants' Exhibit EEE) (emphasis added).

Under these circumstances, the plaintiffs *requested* meetings with Kathy Hartong, Assistant Human Resources Manager (pension claims processor), to apply for pension benefits. At these meetings, Ms. Hartong went over the paperwork required to apply for retirement benefits. Plaintiffs asked whether they needed to retire prior to May 31, 1991 in order to receive retiree health insurance and other benefits disputed at the plant closing collective bargaining sessions. Ms. Hartong suggested that this might be a proper course to take in light of the uncertainty over the ultimate outcome of the plant closing negotiations. Plaintiffs, as stated above, all retired prior to June 1, 1991 under Plan provisions other than § 4.5, although they could have retired at any subsequent time. Some plaintiffs requested special early retirement benefits,[2] in apparent belief that they were

---

**2.** It must be noted, however, that the vast majority of plaintiffs have not applied for these benefits. The plaintiffs who did apply for these benefits were ultimately rejected. (*See infra*)

The collective bargaining agreement in effect at the time of rejection contained a multi-stage grievance procedure culminating in binding arbitration. The Plan incorporates the CBA's

entitled to them under the terms of the plan and the 1985 summary plan description.

In April 1991, Teledyne issued a new summary plan description (SPD) which deleted mention of special early retirement benefits. (*See* Defendants' Exhibit H) At negotiations, the union objected to this deletion absent bargaining. The Company's representatives told the union that the benefit had been deleted from the summary plan description because it was a discretionary benefit which had been administratively deleted by the Plan Committee in the late 1980s pursuant to new Treasury Regulations, issued in late 1988, governing discretionary benefits.[3] The union, after researching the plaintiffs' entitlement to the benefit, agreed that the benefit was discretionary. In fact, Carolyn Wonders, Assistant General Counsel to the International Rubber Workers wrote the following to the local president of the union:

RE: <u>SPECIAL EARLY RETIREMENT BENEFIT</u>

Dear President Boggs:

You have asked for a legal opinion regarding whether employees who will be terminated or who will retire in order to avoid termination, due to the upcoming plant closure, could as a result also be entitled to a special early retirement benefit pursuant to Sections 4.5 and 4.6 of your pension plan.

In my opinion this would be a very difficult argument to make. The reasons are as follows. The intent of those sections was to provide a benefit for employees who for a mental or physical reason could not perform their job duties but at the same time could not meet the qualifications for a disability benefit. The retirement must also be at the company's option or at least with the company's consent. Furthermore the word "retirement" contemplates a cessation of employment due to either advanced age or service, or inability to work due to mental or physical problems. Employees who will be terminated or will retire to avoid termination due to plant closure, could not satisfy the above criteria and would not qualify for the special early benefit.

In summary, I do not believe that it would be in anyone's interest to attempt to pursue this through either arbitration or litigation. If you have further questions regarding this, feel free to contact the Legal Department.

(Defendants' Exhibit D). The union representatives eventually agreed with the company's interpretation, accepting withdrawal of the special early retirement benefit in negotiations on May the 20th, 1991. (*See,* Defendants' Exhibit HHH, Minutes of Effects Bargaining, May 20, 1991) ("J. Grimm: Let's begin by discussing the Special Early Retirement Benefit and employees engaged in a lawsuit against TMR due to this issue. TMR responded to Roetzel

---

grievance procedures. The rejected plaintiffs did not exhaust the Plan's grievance procedures. *See* Docket Nos. 20 and 45 (orders granting in part defendants' motions to dismiss and for summary judgment).

**3.** Following receipt of these regulation in late 1988, Mr. Oddson, the Manager of Retirement Benefits for the parent corporation, decided the special early retirement benefits were prohibited by the regulations and issued a memorandum to local retirement coordinators advising them that these benefits were therefore eliminated from the plan. This memo, dated November 1989, stated:

An employer is no longer allowed to have any discretion as to when an employee retires. Therefore, effective immediately, no benefits are to be paid out under a situation where retirement is conditioned upon the mutual agreement of the participant and the employer (most collectively bargained plan). Such retirement options are generally available under Special Early Retirement or Rule of 65 Retirement. These retirement options have been discontinued and should be eliminated in your next round of union negotiations. (Plaintiffs' Exhibit 9) There is no evidence that *any* employee covered by this plan ever received a special early retirement benefit.

and Andress law firm by providing them with the name of our legal counsel, Brad Smith. If we can agree to eliminate this language, *which we both agree is discriminatory;* we are prepared to discuss issues which can lead to a final agreement.; D. Boggs: This committee or local union has no problem with you removing anything discriminatory, by law, from the contract. You may proceed.") Two days later plaintiffs filed this lawsuit.

In July of 1991, the plaintiffs who had applied for the special early retirement benefit received letters denying their applications. These letters provided, in pertinent part, the following:

> First, you are not entitled to a Special Early Retirement Benefit because that benefit has been eliminated from the Plan. ... Prior to 1989, such discretionary benefits were permissible; however, under regulations issued by the Treasury Department and effective for the Plan on January 1, 1989, a qualified pension plan, such as the Plan, may not provide benefits which are subject to employer discretion. For this reason, Teledyne, as plan sponsor, decided to eliminate Special Early Retirement from the Plan effective January 1, 1989.

> Second, you are not entitled to a Special Early Retirement Benefit because you have already obtained a retirement benefit under another section of the Plan, and a participant may only obtain one retirement benefit from the Plan ... The Plan clearly contemplates that a participant is entitled to only one retirement benefit from the Plan.

> Third, even is Section 4.5 had not been eliminated from the Plan, and even if you had not already retired, you would not be eligible for a Special Early Retirement Benefit, as Section 4.5 requires retirement at the option of the Employer or upon "mutually satisfactory conditions" as evidenced by the written consent of the Employer.

> Fourth, according to your collective bargaining representative, you are not eligible for Special Early Retirement Benefit because that section was intended to provide retirement benefits for participants who were unable to perform their jobs but who did not qualify for a Disability Benefit under Section 4.11 of the Plan.

*(See, e.g.,* Plaintiffs' Exhibit 2).[4] Among the documents the committee examined to reach the above conclusion were the terms of the Plan itself, the '82–'85 Summary Plan Description, the '91 Summary Plan Description, Treasury Regulations, Plant Closure Negotiation Minutes, the letter from Wonder to Boggs quoted above, and various other documents dealing with the history and/or intent of § 4.5 of the Plan.

In August of 1991, the union members ratified the Plant Closing Agreement. That agreement stated in relevant part as follows:

> 8. The Company and the Union agree that the Special Early Retirement Benefit shall be deleted from the Company pension plan as being unlawfully discriminatory.

(Defendants' Exhibit C). In early 1992, the Plan document itself was amended to eliminate the special early retirement benefit, effective as of January 1, 1989. *(See* Defendants' Exhibit BBB)

### III.  CONCLUSIONS OF LAW

As noted above, plaintiffs bring this claim pursuant to section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). These sections permit civil actions by plan partici-

---

**4.** At trial, the defendants' positions is essentially unchanged. They argue that the benefit at issue has been effectively eliminated from the plan, and that even if it were not eliminated, the plaintiffs are not entitled to the benefit under the terms of the plan, essentially contracting the third and fourth reasons offered by the Plan Administrative Committee for the denial of the benefits.

pants, such as plaintiffs, "to recover benefits due him under the terms of his plan". 29 U.S.C. § 1132(a)(1)(B). Plaintiffs charge wrongful denial of benefits.

The first task this court must assume is determination of the proper standard of review. Before 1989, courts reviewed plan administrator's benefit eligibility determinations under the arbitrary and capricious standard borrowed from that developed under 29 U.S.C. § 186(c). *See e.g., Cook v. Pension Plan for Salaried Employees*, 801 F.2d 865, 869–870 (6th Cir.1986). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court rejected the lower courts' reflexive resort to this decidedly charitable standard. [hereinafter *"Firestone"*] Although at trial plaintiffs' counsel repeatedly mentioned the use of an arbitrary and capricious standard, we believe plaintiffs, in reality, were urging the court to follow the position acknowledged by defendants at the summary judgment stage which was that the *de novo* standard is appropriate.[5] (*See* Docket #31 at 10–11).

■ Under the Supreme Court's holding in *Firestone*, courts are to apply the *de novo* standard in the first instance. *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir.1989). As noted by the Sixth Circuit:

> [T]he Court reasoned, under the law as it stood prior to ERISA, employees received *de novo* review, and the Court concluded that it would be anomalous to read ERISA to give plan participants less rights than before.

*Anderson v. Great West Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir.1991) (citing *Firestone*, 489 U.S. at 112–113, 109 S.Ct. at 955–956). Thus, a benefits denial under 29 U.S.C. § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms. *Firestone, supra; Perry v. Simplicity Engineering*, 900 F.2d 963, 965 (6th Cir.1990). This standard is appropriate "regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956.

As previously noted by this court, and conceded by defendant both at summary judgment and at trial, "[t]he Plan at issue does not grant the administrator discretionary authority to determine eligibility for benefits". Consequently, *de novo* review of the Plan Administrative Committee's determination that plaintiffs are not entitled to the special early retirement benefit is appropriate.

The review required by *Firestone*, is a *de novo* review of the record before the administrator or fiduciary:

> If district courts heard evidence not presented to plan administrators, employees and their beneficiaries would receive less protection than Congress intended.

*Perry*, 900 F.2d at 967. The Supreme Court succinctly described *de novo* review in the following manner:

> In determining the appropriate standard of review under § 1132(a)(1)(B), we are guided by principles of trust law.

> · · · · ·

> [S]ettled principles of trust law ... point to *de novo* review of benefit eligibility determinations based upon plan interpretations.... As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation. "The extent of the duties and powers of a trustee is

---

5. Under the arbitrary and capricious standard, "[w]here both the trustees of a pension fund and a rejected applicant offer rational though conflicting interpretations of plan provisions, the trustees' interpretation *must be allowed to con-* trol." *Wells v. U.S. Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1248 (6th Cir.1991) (emphasis added). It should be clear to all concerned that if this standard applied, judgment for defendants would be appropriate.

determined by the rules of law that are applicable to the situation, and not the rules that the trustee and his attorney believes to be applicable to the situation, and by the terms of the trust *as the court may interpret them,* and not as they may be interpreted by the trustee himself or by his attorney." 3 W. Fratcher, Scott on Trusts § 201 at 221 (emphasis added). A trustee who is in doubt as to the interpretation of the instrument can protect himself by obtaining instructions from the court. Bogert & Bogert *supra,* § 559, at 162–168, Restatement (Second) of Trusts § 201, Comment b (1959). See also *United States v. Mason,* 412 U.S. 391, 399 [93 S.Ct. 2202, 2207–08, 37 L.Ed.2d 22] (1973). The terms of trusts created by written instruments are *"determined by the provisions of the instrument as interpreted in light of all circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible."* Restatement (Second) of Trusts § 4, Comment d (1959).

*Firestone,* 489 U.S. at 112, 109 S.Ct. at 955. Thus, as restated by the Sixth Circuit, the "review is not whether the district court was correct in concluding that [defendant's] interpretation of the policy language was arbitrary or capricious, but, under a *de novo* review, which interpretation is more likely to carry out the intent of the parties." *Aubrey v. Aetna Life Ins. Co.,* 886 F.2d 119 (6th Cir.1989). This standard guides our inquiry.

## A. Eligibility for the Benefit

The most logical place to begin review of plaintiffs' eligibility for the special early retirement benefit is with the terms of the Plan itself. As noted above, § 4.5 of the Plan permits such retirement "at the option of the Employer *or* under mutually satisfactory conditions ... if the Employer has confirmed in writing its consent to his retirement." The second of these circumstances, "under mutually satisfactory conditions", is not asserted by plaintiffs for the apparent reason that there is no evidence that Teledyne has given its written consent. Thus, our inquiry is directed to whether plaintiffs have retired "at the option of the Employer".[6]

Plaintiffs contend they retired "at the option of the Employer" for two reasons; to wit, the company's threatened refusal to pay other benefits unless the plaintiffs retired before the 1st of June, 1991 and the company's planned closure of the workplace itself. The defendants dispute the

**6.** As recognized in the findings of fact, the summary plan description (SPD) possessed by plaintiffs stated that "[i]f you are retired under a company initiated retirement, you are eligible to receive a special early retirement benefit." (Defendants' Exhibit G at 100). This same summary was prefaced with a paragraph stating:

> The following represents a summary of principal Plan provisions, but is not intended as a full and complete description of the Plan, which is provided in the formal Plan documents. These documents will govern in all determinations of eligibility for benefits and the amount of these benefits. Copies of the formal Plan documents may be obtained from the Plan Administrative Committee for a reasonable charge or may be inspected at no charge at the Committee's place of business.... Your Personnel Department can answer any questions you may have about the Plan.

*(Id.)* At summary judgment, the plaintiffs asserted "that there is no question here that the terms of the Plan Document ... must control

... the Summary Plan Description has no impact...." (Docket # 38 at 6) It is unclear whether plaintiffs continue to maintain this posture, although this court believes it is correct.

The terms of a summary plan description control only when plaintiffs rely upon either a misstatement contained therein or upon its terms if they conflict with the language of the Plan itself. *See e.g. Flacche v. Sun Life Assur. Co. of Canada (U.S.),* 958 F.2d 730, 736 (6th Cir.1992). Plaintiffs have not alleged either circumstance. It is this court's opinion that such an allegation would be groundless. In the case at bar, the summary plan description entitles one to special early retirement benefits under "a company initiated retirement." The Plan itself permits such benefits when a participant is "retired at the option of the employer". One could not reasonably contend that this summary does not comply with 29 U.S.C. § 1022(a)(1)'s requirements. Indeed, the language of the summary imparts a strikingly similar, if not identical meaning. Any analysis of these terms would render the same result.

veracity of the first reason and assert that the second reason is both inappropriate and illogical. The appropriate place to begin plaintiffs' suggested analysis is with the terms of the Plan itself.

■ Both "option" and "company initiated retirement" clearly contemplate a deliberate action on the part of the employer to bring about retirement. In common parlance, "option" is defined as "an act of choosing" or the "expression of a desire" or "the power or right to choose". Webster's Third New International Dictionary (Unabridged) 1585 (1986) The use of such language clearly contemplates a conscious and deliberate act, on the part of Teledyne, to bring about an employee's retirement regardless of the employee's wishes. Thus, under the terms of the Plan, special early retirement only occurs when the company so chooses, regardless of surrounding circumstance. It requires, in essence, the company's retirement of plaintiffs, not plaintiffs' retiring because of surrounding circumstances.

■ The same result occurs if one examines the language of the summary plan description. Under the SPD, one is entitled to special early retirement if one is retired under "a company initiated retirement". Under such a scheme, the company is required "to begin" or "to bring about" the plaintiffs' *retirement*. Websters Third New International Dictionary (Unabridged) 1164 (1986) In the case at bar, the company's actions are simply causally unrelated to the plaintiffs' retirement. To argue that the company's collective bargaining position or its decision to close its manufacturing facility "initiates" retirement not only ignores the obvious connotation of the term "initiated" but also would lead to a rather absurd result. As noted by plaintiffs' counsel at trial, a "company initiated retirement" requires an involuntary retirement. Here, plaintiffs voluntarily applied for retirement; they requested their appointments with Ms. Hartong. Admittedly, they did so either out of economic necessity or in

an attempt to bolster their claim to other benefits arising from the collective bargaining agreement. However, the company neither requested nor coerced their retirement. The company initiated a plant closing, it did not initiate the retirement of these rather young and entirely satisfactory employees. As the Sixth Circuit stated under similar circumstances, "[plaintiffs] chose to exercise their right to retire precisely in order to avoid termination in the shut down." *Armistead v. Venitron Corp.*, 944 F.2d 1287, 1297 (6th Cir.1991).

This conclusion is strengthened if one considers the less than sensible result were this court to adopt plaintiffs' reasoning. The plaintiffs herein are all entitled to, and are receiving retirement benefits under other provisions of the plan. Section 4.3 of the Plan permits "early retirement" once a participant has either attained the age of fifty-five and has completed at least ten years of service or has completed at least thirty years of service. All plaintiffs save Donald Green meet these requirements. Plaintiffs argue that the requirements of § 4.3, defining who is entitled to "early retirement" describe who is entitled to "special early retirement" under § 4.5 in the event of a company initiated retirement. Thus, they assert that the company's plant closing activities initiated their retirement, bringing them under the particularly generous provisions of § 4.5 of the Plan. While plaintiffs' reasoning holds some appeal, there is no indication *in the Plan* that sections 4.3 and 4.5 are intended to be read conjunctively. Both in the Plan and in the SPD, "early retirement" and "special early retirement" are separately identified and placed in different sections. Each of these sections contain separate qualifications and methods of benefit calculation. There is no suggestion that the requirements of "early retirement" should be engrafted onto the sections pertaining to "special early retirement". The only suggested connection between these provisions are their use of the words "early retirement". Thus, one is eligible for "spe-

cial early retirement" if he is retired "at the option of the employer". This sole requirement illustrates the flaw in plaintiffs' reasoning. Plaintiffs argue that Teledyne's decision to close its facility or its collective bargaining posture forced their retirement at the company's option. Apart from the rather calculated errors in construing the Plan's language this argument invites, it also leads to a senseless conclusion. Under this reasoning, *any* Teledyne employee faced with an actual or perceived adverse action on the part of the company, whether it be termination for improper conduct or, as is the case here, plant closure, could "retire" and claim this generous benefit. Such a result is logically unacceptable.[7]

Plaintiffs are not entitled to special early retirement benefits.[8]

## B. Existence of the Benefit

■ In addition to plaintiffs' ineligibility for the benefit at issue, the defendants claim that the benefit itself was effectively eliminated from the Plan in 1989 pursuant to applicable Treasury regulations. 26 U.S.C. § 411(d)(6) and the regulations thereunder, 26 C.F.R. § 1.411(d)–4 protect accrued benefits. Treasury Regulation 1.411(d)–4 provides that "a plan which permits the employer,[9] either directly or indirectly, through the exercise of employer discretion, to deny a participant a Section 411(d)(6) protected benefit ... violates the requirements of Section 411(d)(6)." As stated in Q & A–4 of the regulation:

> A plan provision that makes a [Code] section 411(d)(6) protected benefit[10] available only to those employees as the employer may designate is within the scope of this prohibition. Thus, for example, *a plan provision under which only employees who are designated by the employer are eligible to receive a subsidized early retirement benefit constitutes an impermissible provision under [Code] section 411(d)(6).*

26 C.F.R. § 1.411(d)–4 Q & A 4(a) (emphasis added).

Plan section 4.5 was just such a benefit. Special early retirement, as provided for in the Plan, was clearly a discretionary benefit violative of the above cited Treasury Regulations. Retirement "at the option of the Employer" gave the Company the right to retire someone upon its own volition. As the regulation makes clear, where the employer's exercise of discretion takes the form of designating the employees who are

(Defendants' Exhibit B, Article III, paragraph 5).

---

7. As dicta, the court should note that section 4.5 of the Plan is, in the opinion of both Teledyne and the Union's counsel, reserved for deliberate use by the company in circumstances where employees could not perform their job duties, but at the same time did not meet the requirements for a disability benefit. (*See e.g.,* Defendants' Exhibit D) The Union's counsel expressed this opinion based upon examination of prior Plan provisions. The Plan Committee, when deciding to reject the plaintiffs' applications for benefits, reviewed these prior plans and came to a similar conclusion. This interpretation finds support in the language of an earlier version of the plan which states:

> Any employee meeting the eligibility requirements of Paragraph 1 [normal retirement], Paragraph 2 [disability] or Paragraph 3 [early retirement] of this Article 3 *may be retired under the Plan by his Employer when he is no longer able to qualify under applicable agreements or regulations for transfer to another job.*

8. The defendants additional reason for denying plaintiffs eligibility for the benefit is the Plan's provision prohibiting duplication of benefits. (*See* § 4.14 of the Plan) Essentially, defendants argue that to the extent plaintiffs seek an additional "double-dip" into the Plan funds, such claims are forbidden under the terms of the Plan. While the court is inclined to agree with defendants' assertion, it seems clear that discussion of this argument only becomes relevant if plaintiffs are *facially entitled* to the benefits at issue, which they are not.

9. The term "employer" includes plan administrators, fiduciaries, and trustees. 26 C.F.R. § 1.411(d)–4 Q & A–5.

10. Under the Code, a "§ 411(d)(6) protected benefit" includes "an early retirement benefit or a retirement type subsidy". 26 U.S.C. § 411(d)(6)(B)(ii). *See also* 26 C.F.R. § 1.411(d)–4 Q & A 1(a)(2).

eligible for a benefit, it is prohibited. As noted above, the union agreed that section 4.5 was unlawfully discretionary and consented to this section's removal from the Plan. The Plan was amended this year, deleting § 4.5 effective as of January 1, 1989. Thus, this court and all involved parties except plaintiffs [11] agree that the benefit at issue violates the Treasury Regulations. It is defendants' compliance with the regulations which provides the basis for this portion of their defense.

▌ The defendants posit that the Treasury regulations demanded immediate compliance with their provisions. Relying upon 26 C.F.R. § 1.411(d)–4 Q & A 8(b), they argue that the regulations provided them with three option to bring them into full compliance with the regulations. They "quote" the language of this section in the following manner:

> If the availability of an ... early ... retirement benefit ... under an existing plan is conditioned on the exercise of employer discretion, the plan must be amended either to eliminate the ... early retirement benefit, ... or to make such benefit available to all participants without limitation, or to apply objective conditions to the availability of the ... early ... retirement benefit.... ˙

---

11. Plaintiffs pursue this reasoning in the following manner:

> First of all, the Special Early Retirement Benefit at issue can in no sense be construed as discretionary. There was no discretion as to providing the benefit if any employee was retired under a company initiated retirement while he or she met the age and service requirements for the Special Early Retirement Benefit set forth in the Plan.

(Docket # 47 at 8) As noted in part A to this opinion, the court believes plaintiffs' reasoning to be without merit. In addition, plaintiffs assert that Teledyne has, under other plans, paid a "special early retirement benefit" to employees whose facilities have been closed. The court must view the relevance of this argument with some skepticism. First, the terms of the other Plan are decidedly different than those in the case at bar. Second, these benefits were paid pursuant to a settlement agreement which specifically provided that the payment of the bene-

(Docket # 50 at 8) (emphasis added) Thus, they argue that they chose the first purported option, elimination of the benefit, effective as of January 1989:

> Thus, prior to the plant closing on June 16, 1991; prior to the time the first Plaintiff retired in April of 1991; and prior even to the time the plant closing was announced in January, 1991, the Company had made a decision to eliminate the benefit from the Plan. The Company decided it would never exercise its option to retire someone under the Special Early Retirement provisions of the Plan.

(*Id.* at 9) The evidence establishes that defendant did indeed choose to eliminate this benefit as early as 1989. However, this court cannot agree that this choice complied with the Treasury Regulations. Complete elimination of the benefit was not an option afforded defendants under 26 C.F.R. § 1.411(d)–4 Q & A 8(b). That subsection, in full, reads as follows:

> (b) *Transitional alternatives.* If the availability of an optional forms (sic) of benefit, early or late retirement benefit, or retirement-type subsidy under an existing plan is conditioned on the exercise of employer discretion, the plan *must be amended either to eliminate* the optional form of benefit, *early or late retirement benefit,* or retirement-type subsidy *to*

fits were offered as "a one time only option." (Plaintiffs' Exhibit 24, at final page) Such an agreement would apparently satisfy the conditions of the treatise, cited by plaintiffs to this court as law, which states that discretionary benefits are permissible if they are:

> a one-time increase in the normal retirement benefit, that is contingent on an event that has independent and substantial business significance ... [when] the event (i.e. the closing) is within the control of the employer.

(Plaintiffs' Exhibit 7 at 25,239) Finally, this court doubts whether the parent company's decision to pay benefits to other employees, represented by another union, under other Plans is relevant to a de novo review of the plan at issue. *See Franklin v. Pitney Bowes, Inc.,* 919 F.2d 45, 48 (6th Cir.1990); *see also* 29 U.S.C. § 1132(a)(1)(B) permitting lawsuits by plan participants "to recover benefits due to him under the terms of *his* plan...."

*make such benefit available to all participants without limitation, or to apply objective and nondiscriminatory conditions to the availability of* the optional form of benefit, *early or later retirement benefit,* or retirement-type subsidy. See paragraph (d) of this Q & A–8 for rules limiting the period during which section 411(d)(6) protected benefits may be eliminated or reduced under this paragraph.

26 C.F.R. § 1.411(d)–4 Q & A 8(b) (emphasis added) This subsection can only be read to provide the employer with two option, to wit: elimination of the benefit to make it available to all participants without limitation or to apply objective and nondiscriminatory conditions as to the benefit's availability. Q & A 8(b) simply lacks the conjunction "or" found in defendants' quotation to the regulation.

Consequently, the benefit was not, in accordance with the Code of Federal Regulations, immediately removed from the Plan. Apparently, then, the special early retirement benefit was still in existence at the time of plaintiffs' application, albeit subject to an *ex post facto* revocation at the start of this year. Such a conclusion, however, does not alter the outcome of this case. As noted above, plaintiffs simply do not meet the qualifications required under either the terms of the Plan or the Summary Plan description.

Accordingly, this court grants judgment in favor of the defendants. This cause is terminated in its entirety.

IT IS SO ORDERED.