66 F.3d 325
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Everett HADIX, et al., Plaintiffs-Appellants,
v.
Perry JOHNSON, et al., Defendants-Appellees.
 Nos. 93-1551, 93-1555, 93-1559, 93-1560, 93-1642, 93-1643.
 United States Court of Appeals, Sixth Circuit.
 Sept. 20, 1995.
 
 Before: NELSON, NORRIS, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 In yet another facet of this long-pending prison conditions case--a case in which a comprehensive consent decree was entered a decade ago--the defendant officials here appeal six orders of the district court.[1] Among the issues we are called upon to decide are these: (1) whether principles of laches and equitable estoppel should have barred the plaintiffs from seeking enforcement of certain provisions of the consent decree after extended acquiescence in the defendants' non-compliance with those provisions; (2) whether the district court abused its discretion in refusing to modify the termination provision of the decree; (3) whether the district court exceeded its jurisdiction in ordering monitoring of health facilities outside the particular prison complex covered by the decree; (4) whether the court abused its discretion in refusing to delete a requirement that the defendants prepare and implement a written mental health plan; and (5) whether certain remedial measures dealing with the provision of mental health services and care for chronically ill inmates were improper in the absence of proof of constitutional violations. For the reasons that follow, we shall affirm the orders in part and vacate them in part.
 
 I.
 
 2
 In 1980 a class of Michigan prisoners incarcerated at the State Prison of Southern Michigan-Central Complex ("SPSM-CC") filed a lawsuit against Michigan officials pursuant to 42 U.S.C. Sec. 1983. Hadix v. Johnson, Civ. No. 80-73501 (E.D.Mich.). The prisoners asserted that the conditions under which they were confined at SPSM-CC violated the Constitution of the United States and the laws of the State of Michigan. On May 13, 1985, the district court approved a consent decree designed "to assure the constitutionality of the conditions under which prisoners are incarcerated." Section II of the decree deals with health care, the area with which the orders now before us are concerned.
 
 
 3
 The decree required the defendants to prepare remedial plans covering implementation of certain of the decree's specific mandates. The remedial plans were to be appended to the judgment, thereby becoming part of it, unless the plaintiffs objected. Three of these plans, the Chronic Disease Plan (Decree Sec. II.A.7), the Staffing Plan (Decree Sec. II.A.5), and the Mental Health Plan (Decree Sec. II.B.3.c; unfiled), are pertinent here.
 
 
 4
 Early in 1984, some four years after the Hadix plaintiffs filed suit, the United States filed a complaint against the State of Michigan under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. Sec. 1997. United States v. Michigan, G84-63 CA (W.D.Mich. filed Jan. 18, 1984) ("USA ").[2] The USA complaint alleged that the conditions under which prisoners were confined in three prisons, including the SPSM, were unconstitutional. On July 16, 1984, a year before entry of the consent decree in Hadix, the USA litigation was settled by a consent decree. Although the overlap between the Hadix and USA decrees is not complete, the decrees are similar in many respects. The Hadix class of prisoners was denied permission to intervene in USA, but it was granted amicus curiae status. 680 F.Supp. 928, 935-43 (W.D.Mich.1987).[3]
 
 
 5
 Because of the overlap with the USA consent decree, and to ensure economical use of judicial resources, the medical and mental health segments of the Hadix case were transferred to the Western District of Michigan. At the time of transfer there was found to have been a tacit understanding that health care issues would be resolved by the Hadix plaintiffs through their amicus role in USA.
 
 II.
 A.
 
 6
 Laches and estoppel are equitable defenses the applicability of which must be decided upon the facts of each particular case. Menendez v. Holt, 128 U.S. 514 (1888). Laches conceptualizes the inequity that would result if a stale claim were permitted to be enforced. Gardner v. Panama Rr. Co., 342 U.S. 29, 30 (1951); Wells v. United States Steel, 950 F.2d 1244, 1250 (6th Cir.1991). A party may not, by silence, create an impression of acquiescence that leads others to make substantial commitments. Independent Bankers Ass'n of America v. Heimann, 627 F.2d 486, 488 (D.C.Cir.1980). The plaintiff must be shown to have been guilty of unreasonable delay prejudicial to the defendant. Gardner, 342 U.S. at 31; Wells, 950 F.2d at 1250. The application of laches is left to the sound discretion of the judge; it does not depend solely on the time that has elapsed between the alleged wrong and the pursuit of a claim. Wells, 950 F.2d at 1250; Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 807 (8th Cir.1979), cert. denied, 446 U.S. 913 (1980). Equitable estoppel additionally "requires an element of deceit in inducing the other party to rely on the initial position." Wells, 950 F.2d at 1250.
 
 
 7
 In the case at bar it appears that for several years the plaintiffs sought to enforce their rights under Hadix through their amicus role in USA. In that role, they helped shape court orders touching directly on matters covered by the Hadix decree. Following our decision in USA v. Michigan, 940 F.2d at 166, which sharply curtailed the "litigating amicus " role of the Knop plaintiffs, defendants unilaterally changed the level of participation previously allowed the Hadix plaintiffs in USA. It was this, apparently, that prompted the plaintiffs to become more active in Hadix.
 
 
 8
 The defendants have not shown that the plaintiffs' conduct led them to make substantial expenditures in complying with the USA decree that they would not have had to make anyway. There has been no element of deceit or misrepresentation here, as far as we can tell. Against this background, and substantially for the reasons given by Judge Enslen in the orders addressing the issue, we conclude that the plaintiffs were not barred by laches or equitable estoppel and the district court committed no abuse of discretion in rejecting this defense.
 
 B.
 Appeal 93-1551
 
 9
 The termination provision in the Hadix decree states that:
 
 
 10
 "After Defendants have complied with all of the provisions of this Consent Decree, Defendants may apply to terminate the jurisdiction of the Court." (Decree Sec. XI.)
 
 
 11
 The defendants sought modification of the decree, to allow partial termination:
 
 
 12
 "Termination of the Court's jurisdiction may be sought by either party as to any provision of the Decree when Defendants are in compliance with the constitutional requirements which were the goal of this decree."
 
 
 13
 The district court denied the requested modification.
 
 
 14
 A consent decree has both contractual and judicial aspects. USA v. Michigan, 940 F.2d at 150; United States v. ITT Continental Baking Co., 420 U.S. 223, 238 (1975). This "strange hybrid," Brown v. Neeb, 644 F.2d 551, 557 (6th Cir.1981), " 'plac[es] the power and prestige of the court behind the compromise struck by the parties.' " Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1017 (6th Cir.1994) (quoting Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983). When construing a consent decree, as when construing other contracts, a court may rely on the usual aids to construction, including "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." ITT Continental Baking, 420 U.S. at 238. Nonetheless, the words contained within the four corners of the document itself should normally determine the scope of a consent decree. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574 (1984). The decree "should be construed to preserve the position for which the parties bargained." Vogel v. City of Cincinnati, 959 F.2d 594, 598 (6th Cir.), cert. denied, 113 S.Ct. 86 (1992).
 
 
 15
 We review a district court's decision on a proposed modification to a consent decree for abuse of discretion. Vanguards of Cleveland, 23 F.3d at 1017; Heath v. DeCourcy, 888 F.2d 1105, 1110 (6th Cir.1989) ("Heath I "). The court's findings of fact will be upheld unless clearly erroneous. Id.
 
 
 16
 A district court has considerable leeway insofar as the modification of consent decrees in institutional litigation is concerned:
 
 
 17
 "To modify such consent decrees, the court need only identify a defect or deficiency in its original decree which impedes achieving its goal, either because experience has proven it less effective, disadvantageous, or because circumstances and conditions have changed which warrant fine-tuning the decree. A modification will be upheld if it furthers the original purpose of the decree in a more efficient way, without upsetting the basic agreement between the parties." Heath I, 888 F.2d at 1110; see also USA v. Michigan, 940 F.2d at 155.
 
 
 18
 This relaxed standard is justified by the impact of such decrees "on the public's right to the sound and efficient operation of its institutions." Heath I, 888 F.2d at 1109. The policy of Heath I is consonant with the Supreme Court's recognition that federal courts must give considerable deference to the judgment of trained prison administrators as to the proper means of running their prisons. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987).
 
 
 19
 The defendants argue here that Freeman v. Pitt, 112 S.Ct. 1430 (1992), requires that piecemeal termination be allowed. We disagree; piecemeal termination might well make sense in the present case, but Freeman does not mandate it. In Freeman, the Supreme Court held that a court had discretion to order an incremental withdrawal of its supervision of a litigated desegregation decree, as long as the withdrawal was "consistent with the purposes and objectives of its equitable power." 112 S.Ct. at 1446. To say that a court has discretion to allow piecemeal termination of a decree imposed without the consent of the defendants is a far cry from saying that incremental termination of the Hadix consent decree is mandatory. The decision in Freeman, moreover, turned on the appropriate definition of a "unitary school district" rather than specific provisions governing termination. The existence of explicit, bargained-for provisions requiring full compliance significantly affects the equities of the instant case.
 
 
 20
 The defendants insist that the full compliance provision exists because the parties to the decree had a common misunderstanding of law, believing that piecemeal termination was unconstitutional. The misunderstanding, they argue, is implicit in the termination language. A clarification of the law supports modification of a consent decree if the party seeking the modification proves that the parties negotiated the provision based on a misunderstanding of the law. Rufo v. Inmates of Suffolk Cty. Jail, 112 S.Ct. 748, 763 (1992). Here the plaintiffs counter that the fact that the consent decree spells out the standard for termination supports the argument that the parties bargained over the conditions justifying termination, and thus did not rely on an erroneous view of the law.
 
 
 21
 We conclude that the defendants have not carried their burden of proof under Rufo or Heath I. See also Heath v. DeCourcy, 992 F.2d 630 (6th Cir.1993) ("Heath II ") (district court lacked authority to terminate supervision under consent decree, contrary to the decree's explicit termination language, where court-appointed monitor has not certified compliance). In this case the district court took Rufo into consideration and followed proper procedure in ruling on the modification motion. See Heath II, 992 F.2d at 635.
 
 
 22
 The defendants argue that the termination provisions should be modified because the split supervision between the Eastern and Western Districts of Michigan makes it more difficult to demonstrate full compliance with the decree. A "significant change in circumstances" that causes a consent decree to become "onerous" may warrant revision of a consent decree. Rufo, 112 S.Ct. at 760-63; Heath I, 888 F.2d at 1110.
 
 
 23
 We are not unsympathetic to the position in which the defendants find themselves. We agree that the split in supervision does require modification of the decree, but only to the limited extent of allowing either district court to withdraw its supervision when the defendants are in full compliance with all provisions of the decree before that court.
 
 
 24
 The language the defendants seek to substitute would work a much broader change in the bargained-for language of the decree--and a modification must not "upset[ ] the core intent, purpose, and scope of the basic agreement between the parties." United States v. Michigan, 940 F.2d at 155; Heath I, 888 F.2d at 1108-09. According to the defendants, their proposed modification would allow the courts to focus on ensuring that prison conditions pass constitutional muster, instead of concentrating on the "minute detail" of the decree itself. This ignores the contractual nature of the decree. Although the overall goal of the consent decree is to ensure that conditions at SPSM-CC are constitutional, the parties bargained for and agreed upon a number of specific provisions--some in "minute detail"--when they formulated the decree.
 
 
 25
 The defendants insist that the district court must find a constitutional violation before it can act. As we recently noted in USA v. Michigan, however, "the Supreme Court has rejected the notion that a court may enforce a consent decree only to the point of ordering relief to which the parties would have been entitled after a trial on the merits." United States v. Michigan, Nos. 94-2391/95-1258, 1995 WL 469430, at * 14 (citing Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522-23 (1986)). With a consent decree, the important consideration is whether the district court is acting according to the scope and intention of what was bargained for. See Lorain N.A.A.C.P. v. Lorain Bd. of Educ., 979 F.2d 1141, 1152 (6th Cir.1992), cert. denied, 113 S.Ct. 2998 (1993). One of the virtues of a consent decree is that it enables defendants to construct a remedy without admitting liability and without lengthy and costly litigation to determine what conditions are, or are not, constitutional. Cf. id. at 1152. The defendants may not use the consent decree as a shield against litigation which might result in specific findings of unconstitutionality and then use the lack of specific findings of unconstitutionality as a shield against the imposition of remedies consistent with the bargained-for terms of the consent decree.
 
 
 26
 Moreover, the Supreme Court has explicitly stated that where specific provisions of the decree require a higher standard, courts should not "rewrite a consent decree so that it conforms to a constitutional floor." Rufo, 112 S.Ct. at 764. As we stated in USA v. Michigan:
 
 
 27
 "[D]efendants cannot insist on the constitutional minimum after deciding to enter into the consent decree and waive the right to establish what remedial measures were constitutionally necessary through litigation. Having entered into a consent decree which obligates them to provide inmates suffering from serious mental illness with adequate care ... defendants cannot now insist that the district court find that conditions at the institutions covered by the consent decree have fallen below the relevant constitutional standards before it orders them to comply with the requirements of the consent decree." USA v. Michigan, Nos. 94-2391/95-1258, 1995 WL 469430, at * 14.
 
 
 28
 The district court, in contrast, did not go beyond the scope of the original decree when it rejected the proposed new language. Consequently, although we think that the split in jurisdiction requires some modification of the consent decree, we do not think that the district court abused its discretion when it refused to modify the termination language of the decree on the defendants' terms.
 
 C.
 Appeal 93-1555
 
 29
 Perhaps the most contentious aspect of the case before us is defendants' assertion that the district court improperly extended its jurisdiction under the consent decree by refusing to bar independent monitoring of Hadix prisoners at institutions outside the SPSM-CC. On the one hand, defendants may not evade the bargained-for requirements of the decree simply by shutting down programs in the Hadix facility, or transferring prisoners out of the Hadix facility to avoid the need for treatment and monitoring. On the other hand, it is a fact of prison life that prisoners are often transferred from one facility to another; the decree is limited in scope, and should not be permitted to extrude itself amoeba-like throughout the Michigan prison system. Moreover, while the defendants may not reduce the quality of care agreed upon under the decree, neither should they feel constrained not to establish new programs and facilities for fear that any Hadix inmate accepted into the new program inevitably brings with him the full gamut of monitoring and decree-related compliance programs.
 
 
 30
 At the time the decree was entered, the defendants furnished three levels of care for mentally ill patients. First, they provided acute care for seriously mentally ill patients at Riverside Psychiatric Center (outside the confines of SPSM) and at an infirmary within the SPSM. Second, intermediate-level protected environment care was provided in a 40-bed unit within the SPSM and in a 96-bed unit at Riverside. Third, outpatient care was provided at SPSM and elsewhere within the Department of Corrections. A remedial Staffing Plan, appended to the decree as required under Sec. II.A.5.f, identified a Protective Environment Unit to be maintained within the SPSM "to serve patients who do not require hospital care, but who are unable to maintain themselves effectively in the general prison population." (Decree Appendix J.)
 
 
 31
 The provision in the decree for a comprehensive system of mental health care also anticipated that inmates would continue to receive some mental health services outside the confines of the SPSM-CC:
 
 
 32
 "Within 270 days after the entry of the Judgment in this matter, the Department shall submit a professionally designed plan to assure that prisoners with serious mental illnesses have adequate access to Riverside Psychiatric Center or to other similar facilities fully licensed or operated by the Michigan Department of Mental Health." Hadix Decree Sec. II.B.3.c (emphasis added).
 
 
 33
 The decree thus envisoned that if Riverside became unavailable, Hadix inmates would receive equivalent treatment at unspecified facilities outside the SPSM. The Decree also required provision of a psychiatric unit at a "new hospital" (now Duane Waters Hospital) outside the physical boundaries of the SPSM. (Decree at Sec. II.B.2, Sec. II.B.4.1.)
 
 
 34
 In later years the acute care unit was transferred from the SPSM infirmary to the Duane Waters Hospital. The Protective Environment Unit at SPSM was closed in 1988. As a result of that closure, mentally ill Hadix prisoners in need of intermediate-level care are now treated both at Riverside and at a comparable facility at Huron Valley Men's Facility. Defendants have also added several other mental health facilities, such as a Comprehensive Care Unit, Crisis Stabilization Unit, and Residential Treatment Program, none of them at the Central Complex of the SPSM.
 
 
 35
 Because of the closure of some mental health facilities, and expansion of others, the Independent Monitors in 1992 asked the district court for clarification of the extent to which the plaintiffs could monitor care received by prisoners at facilities not mentioned in the original decree. The defendants then moved to preclude all monitoring of mental health services outside the SPSM-Central Complex. The district court denied this motion, holding that "monitoring is authorized to determine compliance with Section II.B.3.c. at locations beyond those facilities initially named in the Decree for the sole purpose to determine whether Hadix prisoners, transferred to facilities beyond the Consent Decree with medical orders to receive Decree-mandated services, receive those particular services."
 
 
 36
 Defendants now urge us to bar all monitoring outside the SPSM-CC, maintaining that the March 1993 order improperly extends the jurisdiction of the district court because "Corrections Officials did not agree that the decree applies in any way to non-consent decree facilities." We decline to go so far, because the plain language of the decree negates any implication that only the SPSM-CC is a "decree facility." The decree explicitly mentions access by Hadix prisoners to Riverside, the "new hospital" (Duane Waters Hospital), and "other similar facilities fully licensed or operated by the Michigan Department of Mental Health." (Decree Sec. II.B.3; emphasis supplied.) At the time the consent decree was issued, it was thus recognized that some mental health services would be provided outside SPSM, and that the location(s) at which the services would be provided might change. This distinguishes the case at bar from USA, where we held that a decree-mandated classification plan could not be extended to institutions not named in the consent decree. USA v. Michigan, 940 F.2d at 159. It also distinguishes it from Navarro-Ayala v. Hernandez-Colon, where the First Circuit refused to authorize monitoring of inmates at a facility not covered by a consent decree. 951 F.2d 1325, 1346 (1st Cir.1991). In Navarro-Ayala, inmates were permanently transferred to another facility to alleviate overcrowding. Monitoring was not allowed at the transferee facility, because the defendants never agreed to such monitoring. That is not the case here.
 
 
 37
 Under the district court's order, monitoring is strictly limited to prisoners incarcerated at SPSM-CC who leave the facility to receive mental health services mandated by the original decree:
 
 
 38
 "[T]he Court does not find that such monitoring, supervision and control is generally permitted. Rather, the Court rules against the Defendants' proposal for a general prohibition on such monitoring, supervision, and control, without specific consideration of the prohibition's relationship to other plans, orders, and agreements already entered in this case."
 
 
 39
 This language implies that the order at issue here, unlike the order overturned in Navarro-Ayala, does not contemplate following and monitoring permanent transferees.
 
 
 40
 We also note that requiring the defendants to permit monitoring of Hadix prisoners at facilities outside the SPSM is significantly less intrusive than requiring the state to increase monetary funding (forbidden in Lorain NAACP, 979 F.2d at 1152) or establishing recordkeeping procedures at facilities outside the scope of a consent decree (forbidden in USA v. Michigan, 940 F.2d at 159). The district court indicated that such monitoring did not necessarily entail giving the plaintiffs physical access to the institutions in question, if the necessary information can be gleaned from appropriate reports. (Opinion of March 5, 1993.)
 
 
 41
 Finally, we note that the Independent Monitors' request for clarification was prompted by their findings that mentally ill prisoners within the Hadix class, particularly those requiring intermediate/protective environment care, were not receiving adequate access to psychiatric facilities. Intermediate/protective environment care is clearly mandated by the decree. In particular, unavailability of beds at Riverside--a facility named in the Decree--meant that Hadix prisoners were instead routinely sent to the Huron Valley Intermediate Care Program. Because adequate access to in-patient mental health services was part of the original Hadix Decree, the district court did not abuse its discretion in refusing to bar monitoring of decree-mandated mental health services care which Hadix prisoners receive in treatment programs conducted outside the SPSM-CC.
 
 
 42
 Nonetheless, the defendants' concerns about the efficient administration of the prison system are legitimate, and we owe their judgment considerable deference. O'Lone v. Estate of Shabazz, 482 U.S. at 353. The defendants correctly note that the prison population is transient and that transfers based on security and safety concerns are made with some frequency. Despite the limitations established by the district court, there is an information-gathering aspect of the March 5 order that could be read to allow virtually unfettered monitoring on a temporary basis, albeit to accumulate evidence from which the court can determine where permanent monitoring should be allowed in future. It should be made explicit that monitoring outside the SPSM-CC does not apply to transfers based on security or safety concerns or for other administrative reasons, but applies only to Hadix prisoners who are sent outside the confines of the SPSM-CC temporarily for the purpose of receiving mental health care, with the anticipation that they will return to the SPSM-CC once treatment is complete. Where the plaintiffs seek to monitor treatment provided outside the SPSM-CC at a facility to which the decree does not specifically refer, we think it should be clear that plaintiffs bear the burden of showing, (1) that Hadix inmates are receiving treatment equivalent to treatment referenced in the original decree and its attached plans; (2) that Hadix prisoners receive such decree-mandated treatment at the outside facility on a regular basis; and, (3) where physical access is sought, that plaintiffs are unable to determine compliance through less obtrusive means, such as reports and other prison documents. We shall therefore vacate the order and direct that it be reformulated in a manner not inconsistent with this opinion.
 
 Appeal 93-1643
 
 43
 The district court did not abuse its discretion in refusing to delete the requirement that the defendants submit a remedial Mental Health Plan in writing. The purpose of such a plan is to assure that prisoners with serious mental illnesses have adequate access to psychiatric facilities, especially the Riverside Psychiatric Center, and a full range of in-patient, out-patient, and follow-up care. (Decree Sec. II.B.3.) The defendants acknowledge that they never submitted a formal plan, but they contend that they have already implemented a plan and reducing it to writing is unnecessary. The district court disagreed, and we cannot say the court was wrong.
 
 
 44
 The district court made extensive findings of fact demonstrating that the defendants have not met their obligations regarding the Mental Health Plan. These findings, based on the evidence submitted, are not clearly erroneous. While the court agreed that the defendants have made improvements in mental health services, it found these improvements had not yet met the level of full compliance and were deficient with regard to follow-up care. Circumstances had not changed sufficiently, the court concluded, to warrant modification of the decree by deleting the requirement to submit a Mental Health Plan. See Heath I, 888 F.2d at 1110; Vanguards, 23 F.3d at 1018. We are not persuaded that the court abused its discretion in reaching this conclusion.
 
 
 45
 More problematic is the district court's requirement that the defendants adopt some of the USA mental health provisions. The court "estopped" the defendants:
 
 
 46
 "from diminishing, for Hadix prisoners, the services and programs provided pursuant to the Stipulation of May 29, 1991 and the Orders of June 29, 1992 and September 8, 1992, in United States v. Michigan[4] ... inasmuch as Hadix prisoners are already beneficiaries of those Orders." (Order of April 12, 1993.)
 
 
 47
 In structuring this remedy, the court found that the relevant substantive language of the Hadix and USA decrees was "practically identical," and that differences in eligibility were of "limited significance for these motions." Both decrees require the defendants to provide services consistent with contemporary professional standards of care, and both focus on treatment for serious mental illness. See Hadix Decree Sec. II.B.1.a.3 ("The right to treatment is ... limited to that which can be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable"). The remedy was adopted "to avoid repetitive and potentially contradictory legal processes."
 
 
 48
 It is true that the medical and mental health provisions of the Hadix case were transferred to the Western District of Michigan precisely because of the overlap with the USA consent decree, and to ensure economical use of judicial resources.[5] For the most part, the district court has not imposed upon the defendants any obligation that they do not already have. Also, the court specifically recognized that the jurisdiction and scope of Hadix and USA differ, and stated that it "is not prepared to simply adopt or incorporate USA plans and orders as necessary or sufficient to satisfy Hadix." (Order of April 12, 1993.)
 
 
 49
 Nevertheless, despite the court's jurisdiction over the defendants in both decrees, the Hadix inmates do not have standing to litigate the terms of the USA decree--and given the history of this case, it appears improbable that they would hesitate to avail themselves of such an opportunity if it were given them. The "estoppel" remedy has the effect of elevating the plaintiff class to the status of "litigating amicus " regarding the implementation of the USA decree in Hadix facilities--a status we barred in United States v. Michigan. 940 F.2d at 166. This provision remedy must therefore be deleted.
 
 Appeal 1642
 
 50
 All prisoners arriving at the SPSM-CC receive an initial screening at the Reception and Guidance Center ("R & GC"). Section II.B.5 of the decree requires that this screening include professionally designed psychological evaluation and testing. Inmates "whose offense, test results, or behavioral history indicate a need for further screening" must have a personal interview with a licensed professional; "[t]he recommendations resulting from the screening shall be implemented in a program plan developed for each inmate at SPSM." (Hadix Decree Sec. II.B.5.)
 
 
 51
 In its opinion of April 2, 1993, the district court limited the broad language of the latter provision by stating that a "program plan" need be "implemented" only for patients diagnosed with serious mental illnesses. This limitation is in keeping with the general requirement that the right to treatment does not extend to any treatment deemed desirable, but is limited to what is medically necessary. (Hadix Decree Sec. II.B.1.a.3.) For seriously ill inmates, however, the court found it insufficient simply to diagnose a serious condition and formulate a program plan: "implementation" means that the "program plan" must actually be carried out. (Opinion of April 2, 1993.) This finding is consonant with the generally accepted meaning of "implementation." The court also determined, in specific findings of fact, that the defendants did not implement the professional recommendations for each inmate at the SPSM-CC, and thus were not in compliance with the decree.
 
 
 52
 Despite these findings, the district court declined to enforce this aspect of the decree. Recognizing that the provision of some mental health services took place outside the physical boundaries of the SPSM (see supra, Appeal 93-1555), Judge Enslen stated that
 
 
 53
 "the Court will defer specific enforcement of this obligation until defendants submit (and the Court approves and appends to the Decree), the mental health plan required by section II.B.3.c. of the Decree. The Court expects that Defendants will be accorded the discretion, in fashioning that plan, to locate their mental health programs where they see fit, provided that they continue to demonstrate full implementation of treatment program plans for Hadix prisoners." (Opinion of April 2, 1993.)
 
 
 54
 In effect, the district court is requiring defendants to incorporate into the Mental Health Plan, procedures for implementing treatment programs for patients initially diagnosed with serious mental illnesses. To this extent the April 2 order is clearly within the scope of the decree.
 
 
 55
 The district court also found that it lacked sufficient information to determine whether or not the defendants were complying with the implementation of treatment plans under the consent decree. For this reason, it ordered the Decree Compliance Coordinators to add to their quarterly reports the following information regarding prisoners diagnosed with serious mental illnesses: (1) the R & GC's prognosis for curing or alleviating the mental illness; (2) recommended treatment; (3) how the recommended treatment is being implemented; and (4) the subsequent clinical status of prisoners initially diagnosed with serious mental illnesses. The source and format of this information is left to the defendants' discretion. As with the order of March 5, 1993 on monitoring (Appeal 93-1555), the defendants must include information regarding inmates who are transferred to facilities outside the confines of the SPSM-CC to receive decree-mandated services.
 
 
 56
 The defendants argue that the order improperly extends the jurisdiction of the district court. But as we noted previously, the decree clearly envisions that some Hadix inmates will receive decree-mandated services outside the confines of the SPSM. The instant order is appropriately limited to decree-mandated services, and does not "extend generally to such facilities or apply generally to other prisoners housed at such facilities." (Order of April 2, 1993.) As with the monitoring order, however, we think that there needs to be more explicit assurance that the order covers only Hadix inmates who receive decree-mandated treatment outside the SPSM-CC with the expectation that they will be returned to the main Hadix facility once treatment is complete. With this restriction, the order does not improperly enlarge the district court's jurisdiction beyond the scope of the original decree.
 
 Appeal 1560
 
 57
 As noted above, the decree required defendants to provide "access to the in-patient care facility ... for systematic outpatient care, follow-up care, as well as continuity of care for inmates with serious mental illness.... Staffing provisions shall meet contemporary professional mental health standards to provide necessary outpatient and psychological care for seriously mentally ill inmates." (Decree, Sec. II.B.3.c.) In February of 1986 the defendants submitted a Hospital Staffing Plan, which the district court approved and appended to the decree. (Decree App. I.) The Staffing Plan required maintenance of a Protective Environment Unit at SPSM "to serve patients who do not require hospital care, but who are unable to maintain themselves effectively in the general prison population." At the time the decree was entered, such a facility existed within SPSM.
 
 
 58
 The plaintiffs asked the district court to find that the Staffing Plan had not been complied with. The court found that defendants were non-compliant with respect to the Protective Environment Unit, because "[t]his unit has been relocated outside of SPSM and the authorized positions redeployed, but the plan has not been updated." The court ordered the defendants to remedy their non-compliance either by (1) reinstituting the 40-bed Protective Environment Unit; (2) submitting a plan "to modify the Staffing Plan including the Protective Environment," or (3) submitting a plan that "provides for an appropriate substitute for the 40-bed Protective Environment." The remedy is a flexible one, and the district court did not abuse its discretion in imposing it.
 
 D.
 Appeal 1599
 
 59
 As required under Sec. II.A.7 of the consent decree, the defendants submitted a Chronic Disease Plan in September of 1985. The plan was subsequently attached to the consent judgment. The district court found that the defendants were not in compliance with this plan, because they failed to (1) submit annual reports concerning the goals and changing needs of the plan and (2) provide periodic medication reviews for prisoners with certain medical conditions. The court ordered the defendants to submit the required compliance reports and also ordered them "to modify compliance with treatment orders when non-compliance could, in the opinion of medical staff, result in serious harm to the prison population and staff." The district court noted that the threat of contagion from "new forms of certain epidemic diseases," specifically tuberculosis, justified "strict medication compliance" in some instances.
 
 
 60
 There are problems with the way the court phrased its order. The court states that because the Chronic Disease Plan already requires medication review, it does not consider the order to be a modification of the decree. Nevertheless, the order itself specifically instructs defendants "to modify compliance." To justify modification of a consent decree, plaintiffs must establish (1) that a significant change in circumstances warrants review and modification of the consent decree, and (2) that the modification is suitably tailored to remedy the problem resulting from the changed circumstances. Rufo, 112 S.Ct. at 760. The opinion contains a heading "Plaintiffs have not met their burden under Rufo. "[6] The analysis in this section suggests, to the contrary, that the court believes that the Rufo test has in fact been satisfied.
 
 
 61
 This order requires clarification, at a minimum, especially in light of the fact that the defendants planned to change their medical distribution system anyway.[7] It is difficult to resolve the tension between the court's decision not to order specific operational changes, with its mandate to "monitor compliance with treatment orders when non-compliance could, in the opinion of medical staff, result in serious harm to the prison population and staff." This simply amounts to an order to "do something different." The order does not, as the defendants assert, explicitly order corrections officials to observe inmates' ingestion of medication directly.[8] Indeed, the opinion states that "[t]he decision about how to accomplish this is left to the discretion of the Defendants." The court did, however, find the present system, in which the prisoners themselves filed reports regarding their compliance with treatment orders, inadequate. If a self-observation system is inadequate, it is difficult to see what alternative to staff observation defendants have "discretion" to impose. If the court merely meant that "once a prisoner is diagnosed with a contagious disease serious enough to cause risk to others, some higher level of monitoring is necessary," it should have said so.
 
 
 62
 We do not dispute reports expressing concern over the danger that resurgent diseases such as tuberculosis pose to the prison population in general. Nonetheless, there appears to be an absence of facts on the record regarding the incidence of serious contagious disease, like tuberculosis or AIDS, at the Hadix facility itself. The district court made no findings of fact in this regard; it simply "note[d] the emergence of new forms of epidemic diseases ... requir[ing] strict medication compliance[.]" Without specific information, it is difficult to determine how obtrusive a given remedy may be. Because the order of March 26, 1993 is based on inadequate findings of fact, we think it better to let the defendants complete those modifications they have already found necessary, and then assess the adequacy of the changes in light of heightened concern over new and resurgent contagious diseases, and the incidence of such diseases with the state prison system of Michigan. Accordingly, we vacate the March 26, 1993 order and remand the matter to the district court to await defendants' proposed changes and for further findings of fact.
 
 
 63
 For the foregoing reasons, we AFFIRM the orders in part, VACATE them in part, and REMAND the case to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 These orders, identified by their respective appellate court docket numbers, covered the following matters: 93-1551, denial of the defendants' motion to modify the termination provision of the decree; 93-1555, denial of the defendants' motion to bar monitoring of facilities in which mental health services required by the decree are provided outside the Central Complex of the State Prison of Southern Michigan; 93-1643, denial of the defendants' motion to delete the decree's requirement for preparation and implementation of a mental health plan and requiring the defendants to adopt a remedy until such mental health plan is prepared; 93-1642, order that the defendants submit reports on the development and implementation of treatment plans for new prisoners diagnosed with serious mental illnesses; 93-1560, order that the defendants show that a replacement exists for mental health services lost when a Protective Environment Unit was closed at the Central Complex; and 93-1599, order that the defendants update their chronic care plan to ensure that medical staff are adequately informed about prisoners who have contagious diseases and who fail to comply with medical treatment
 
 
 [2]
 For the early history of this case, see United States v. Michigan, 940 F.2d 143, 147 (6th Cir.1991). The most recent decision of this court in the USA case also addresses mental health and jurisdictional issues. United States v. Michigan, Nos. 94-2391/95-1258, 1995 WL 469430 (6th Cir. Aug. 7, 1995)
 
 
 [3]
 The Hadix class of prisoners differs from the class of prisoners who filed a Sec. 1983 complaint in Knop v. Johnson, G84-651-CA5 (W.D.Mich., filed 1984). The Knop class included prisoners incarcerated at the two prisons other than SPSM included in the USA complaint. The Knop plaintiffs' claims were dismissed in exchange for "litigating amicus curiae " status in the USA case, where, with the permission of the district court, they replaced the National Prison Project-American Civil Liberties Union and the American Civil Liberties Union Foundation of Michigan, which also had "litigating amicus " status in USA. See United States v. Michigan, 940 F.2d 143, 147 (6th Cir.1991); Knop v. Johnson, 700 F.Supp. 1457 (W.D.Mich.1988). Our decision in USA v. Michigan, 940 F.2d at 164-67, curtailed the "litigating amicus " status of the Knop prisoners but did not directly concern the Hadix class
 
 
 [4]
 The stipulation of May 19, 1992, largely addresses the development of the Huron Valley mental health facility, an agreement of compliance with previous orders, plans, and agreements, and conditions at Riverside Psychiatric facility. The Orders of June 29, 1992 and September 8, 1992 modify and approve the May stipulation
 
 
 [5]
 Indeed, defendants themselves moved to appoint the USA Independent Monitor to the same role in Hadix because of the substantial congruence between the two decrees, with the result that "[e]ven assuming that the standards of compliance may differ between Hadix and USA in specific instances, nevertheless the proofs regarding the existent circumstances are going to be the same." (Motion of Sept. 2, 1988.)
 
 
 [6]
 The court did reject, as medically inappropriate, plaintiffs' proposed remedy of a specific system of review and automatic renewal of medication orders
 
 
 [7]
 Among other things, defendants changed from an annual review of medications to a quarterly review
 
 
 [8]
 Defendants' argument that the order elevates the observation of an inmate's ingestion of medication to a constitutional requirement is without merit